FILED
U.S. DISTRICT COURT
DISTRICT OF KANSAS

APR 2  1 12 PH '98

RALPH L. McCLOSH,
CLERK
BY B.⎯⎯⎯ DEPUTY
AT TOPEKA, KS.

# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS

WILLIAM I. KOCH, et al.,

          Plaintiffs,

Vs.                      No. 85-1636-SAC

KOCH INDUSTRIES, INC., et al.,

          Defendants

## MEMORANDUM AND ORDER

The case comes before the court on the defendants' supplemental motion to strike new damage contention and motion in limine to exclude evidence thereon (Dk. 688). The plaintiffs initially filed a brief on their damage claims (Dk. 690) and a brief in response to the defendants' motion (Dk. 703). The defendants filed a reply brief on March 16, 1998. (Dk. 710). Two days later, the plaintiffs filed a motion for leave to file a sur-reply to which they attached their sur-reply (Dk. 712). Finally, the defendants filed on March 20, 1998, a response (Dk. 721) opposing the plaintiffs' motion for leave to file a sur-reply and asking the court for an opportunity to respond in the event the court permits the filing of the plaintiffs' sur-reply.

**PROCEDURAL HISTORY**

In describing the relevant procedural history, the court will highlight the other motions and rulings leading up to the defendants' supplemental motion. The defendants' filed on January 23, 1998, a "Motion To Strike Plaintiffs' New Claim Contained In The Court's Proposed Final Pretrial Order Under 'Itemization of Damages'" (Dk. 660). The court granted in part this motion as reflected in the final pretrial order (Dk. 676) and in the memoranda and orders (Dks. 675 and 683) filed February 6, 1998, and February 17, 1998, respectively. In that motion, the defendants argued that the plaintiffs had inserted in their revised itemization of damages filed January 5, 1998, a new damages claim for the undervaluation of KII's disclosed earnings that was supported by their expert's 1997 revised damages report. (Dk. 660, p.3). The defendants calculated that the new claim increased the plaintiffs' total damage claim by another $42.82 per share.

In their motion, the defendants also called the court's attention to the following paragraph from the plaintiffs' itemization in the pretrial order:

> (b)     The incremental amount above $200 per share (plus a share of the Santa Barbara offshore oil field) that plaintiffs would have obtained in knowledgeable negotiations with KII for sale of their stock was at least $120 per share. Defendants' misstatements and omissions induced plaintiffs to underestimate KII's cash flow and its ability to borrow and repay debt for purchasing plaintiffs' stock.

(Dk. 676, p. 9). The defendants limited their argument against this paragraph to

2

the following:

> Although we have had no discovery on this claim because it has never
> been made before, it clearly appears that plaintiffs' assertion that they
> would have negotiated for "at least $120" more per share, contained in yet
> another new paragraph of their damage contentions, beginning at the
> bottom of page 13 of the Court's proposed order is derived by adding the
> above $42.82 per share increase to the $78.60 damage calculation based
> on the specific refinery and accounting claims, which number appears on
> the bottom of page 6 of the new Patricof report, Exhibit A, and on page
> 13, line 11 of the Court's proposed Pretrial Order.

(Dk. 660, p. 5). Because the court did not understand the plaintiffs' alternative

damage theory to be necessarily premised on Patricof's report and the opinion

and numbers therein, the court rejected the defendants' assumption concerning

the common "$120" allegation. For that reason, the court also did not consider

the defendants' principal contentions against Patricof's report to likewise be

directed at the plaintiffs' alternative damage theory and its corresponding

allegations in the pretrial order.

At the status conference on February 9, 1998, the defendants'

counsel asked the court to remove from the pretrial order all assertions regarding

this alternative damage theory. The plaintiffs' counsel responded that this

damage theory had been in the first draft of the pretrial order submitted in 1993

and that they just provided more detail in their most recent itemization of

damages. The plaintiffs' counsel explained that the claim as to the incremental

amount above $200 that the sellers would have obtained in knowledgeable

negotiations "is the out-of-pocket standard of damages that applies under rule

3

10(b)5 under the cases like the Supreme Court's Affiliated Citizens case. That is

the standard measure of damages." (Dk. 681, Transcript of Status Conference, p.

43). The plaintiffs' counsel further explained that the $120 damage calculation

in subparagraph (b) is not the sum of any numbers taken from Patricof's report,

as the defendants' assumed, and that this number would be established through

the trial testimony of fact witnesses. After counsel exchanged additional

comments, the court set down a time for the defendants to file an additional brief

and for the plaintiffs to respond. Having received those briefs, and more,[1] the

court is ready to rule insofar as the present record permits.

## DAMAGE CONTENTIONS AT ISSUE

The defendants' supplemental motion challenges two portions of

the plaintiffs' itemization of damages which have been quoted and bolded below:

> Plaintiffs contend that the appropriate measure of damages is either
> (1) the difference between the price actually paid for their stock and the
> fair market value of KII stock sold on June 10, 1983, **or (2) the
> incremental amount above $200/share (plus a share of the Santa
> Barbara offshore oil field) that the selling shareholders would have
> obtained in knowledgeable negotiations with KII for the sale of their
> stock, whichever is greater.** In the event that the Court allows inquiry
> into KII's post 1985 financial condition, plaintiffs reserve the right to
> claim the benefit KII derived from fraudulently inducing the selling

_____

[1]The court grants leave for the plaintiffs to file their sur-reply and denies
the defendants' request to file another response. As the pending matter fully
demonstrates, counsel with each additional filing transform what is merely hard
to grasp into what is almost unfathomable. Believing that it understands enough
to rule on the pending motion, the court has neither the time nor the inclination
to decipher yet another filing on this matter.

4

shareholders to sell.

(a)     The fair market value of KII stock sold in June 1983 includes (in addition to the $200/share purchase price plus the Santa Barbara interest) the value of KII's hidden or misstated earnings resulting from defendants' misrepresentations and omissions related to the company's condition, performance and prospects.

The fair market value of KII's hidden or misstated earnings at June 1983 was at least  $73.10 to $78.60 per share (*i.e.,* incremental value above the purchase price). The derivation of this number is detailed in Patricof & Co.'s "Revised Report on Damages" (Nov. 17, 1997).

**(b)     The incremental amount above $200 per share (plus a share of the Santa Barbara offshore oil field) that plaintiffs would have obtained in knowledgeable negotiations with KII for sale of their stock was at least $120 per share. Defendants' misstatements and omissions induced plaintiffs to underestimate KII's cash flow and its ability to borrow and repay debt for purchasing plaintiffs' stock.**

(Dk. 676, p. 9). The bolded material appearing in the first paragraph was

included in the parties' proposed pretrial order submitted in the last part of 1993.

The bolded material appearing at the end as subparagraph (b) was not added

until the plaintiffs filed their revised itemization of damages on January 5, 1998.

**ARGUMENTS**[2]

Prior to filing any response, the plaintiffs submitted a

memorandum that laid out their overview of the law and factual analysis

governing their two alternative damages claims.   The plaintiffs say their two

---

[2]Than in previous orders, the court will go to greater lengths here to set out the convoluted arguments, theories, and evidence at issue. The court's reasons for doing so are to show its dismay over such complex and involved matters being raised now with the trial only weeks away, its frustration with the plaintiffs' recent remodeling efforts of their claims and damage theories, and its weariness with the counsels' persistent efforts to obfuscate the issues through semantic sleight-of-hand.

damage measures are patterned after the first two damage formulations that were summarized from the jury instructions reviewed "in one of the leading cases under SEC Rule 10b-5, *Myzel v. Fields*, 386 F.2d 718 (8th Cir. 1967), *cert. denied*, 390 U.S. 951 (1968)."[3]  (Dk. 690, p. 3).  Based on the following excerpt from *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), the plaintiffs presume that the second damage formulation from *Myzel* is the standard measure of Rule 10b-5 damages:

> In our view, the correct measure of damages under § 28 of the Act, 15 U.S.C. § 78bb(a), is the difference between the fair value of all that the mixed-blood seller received and the fair value of what he would have received had there been no fraudulent conduct, *see Myzel v. Fields*, 486 F.2d 718, 748 (8th Cir. 1967), *cert. denied*, 390 U.S. 951 (1958), except for the situation where the defendant received more than the seller's actual loss.  In the latter case damages are the amount of the defendant's profit.  *See Janigan v. Taylor*, 344 F.2d 781, 786 (1st Cir. 1965), *cert.*

---

[3]In that case, the Eighth Circuit summarized the trial court's instruction on damages, as follows:

> The court told the jury (1) that the least amount that could be recovered would be "the difference between the selling price of the stock and the actual value of the stock when sold."  This, of course, is similar to the traditional "out of pocket" theory of damages recoverable for deceit. . . .  (2) A higher amount could be recovered if the jury found that upon full disclosure the plaintiffs would nevertheless have sold to defendants, but at a higher price.  Then the measure of the damages would be the difference between what they actually received and the higher price.  (3) And finally, if the jury found that the plaintiffs, upon a complete disclosure, would have retained the stock, then the jury could consider "the subsequent increases in the value of the stock over . . . a reasonable period.

*Myzel v. Fields*, 386 F.2d at 744-45.

6

*denied*, 382 U.S. 879 (1965).

406 U.S. at 155. The plaintiffs observe that this formulation is generally regarded as the "out of pocket" measure of damages.

The plaintiffs expound that fair market value is but one "effort" to gauge the "actual value of the stock when sold" as so described in *Myzel*. It is a measurement "customarily sponsored by expert witnesses." (Dk. 690, p. 5). Their damages expert witness, Kenneth McGraw, will testify in support of the plaintiffs' fair market value measurement. The plaintiffs delineate what would have been their damages for the undervaluation of disclosed earnings had the court not granted the defendants' first motion to strike this element from their claim for fair market value damages.

The plaintiffs denominate their second damage formulation as "Damages by the Cash Flow Method." (Dk. 690, p. 9). The plaintiffs say this method "poses a question of causation and historical fact: what would have happened differently in 1983 if there had been no fraudulent conduct by defendants? That is, how would the negotiations have likely developed if the concealed information had been known to plaintiffs?" (Dk. 690, p. 9). The plaintiffs give a brief factual account of how in the late fall of 1982 they changed the focus of their negotiations to "what could KII afford to pay for the plaintiffs' stock." *Id.* at 10. They directed their investment bankers to evaluate KII using a leveraged buyout/cash flow method. Under this method, "the focal question was

not the abstract issue of 'what the stock is worth' but rather, what the company, as a buyer, could afford to borrow and pay back from its cash flows." *Id.*

As William Koch has testified, he believed that KII could not afford to finance more than $240 per share. The plaintiffs anchor their damages by the cash flow method on several allegations, including: (1) that in 1982 the plaintiffs underestimated KII's cash flow by $150 million, (2) that each $10 million in cash flow allowed KII to finance approximately $10 per share, and (3) that the cash flow analysis used by their investment banker, Bain & Co., included figures for depreciation and capital expenditure that were much larger than those used by KII's senior accountant, Milton Hall, to assess KII's purchase of the plaintiffs' stock in the Spring of 1983. The plaintiffs translate these allegations into the following damages: "Damages of $120 per share is plaintiffs' estimate of the increased price they would have obtained if they had known KII was able to pay $352 per share, not $240, and if they had negotiated a price in the same proportion to an opening demand of $352 per share that they, in fact, negotiated from their opening demand of $240 per share." *Id.* at 15. The plaintiffs reveal that this claim "will be supported by the trial testimony of plaintiffs' fact witnesses who participated in the 1983 negotiations." *Id.* The plaintiffs end their damages brief by reiterating their position that the cash flow damages are but another measure of "out of pocket" damages as described in *Affiliated Ute* and *Myzel.*

8

In their motion, the defendants first attack the plaintiffs' second measure of damages as contrary to the law on Rule 10b-5 damages. The defendants say the traditional measure of "out-of-pocket" damages is the difference between the fair market value of the shares and the price paid to the seller. This measure "does not permit them [the plaintiffs] to measure damages by speculation that they might have negotiated a price that is **more** than the fair value of the stock they sold." (Dk. 688, Defendants' Supplemental Motion, p. 4). The defendants cite *Kohler v. Kohler Co.*, 208 F. Supp. 808 (D. Wis. 1962), *aff'd*, 319 F.2d 634 (7th Cir. 1963), as rejecting under similar circumstances a defrauded seller's claim that if he had known all material facts then he would have held out for a higher price. Calling the plaintiffs' alternative damage theory nothing more than speculation, the defendants ask the court to strike it from the pretrial order, to not instruct the jury on such a theory, and to bar testimony or argument suggesting that the jury may award damages on such a theory.

The defendants' other principal contention is that the court should strike any damages claim based on the defendants' "borrowing" power as it was not raised until the plaintiffs submitted their latest revised itemization of damages. The defendants also insist they will suffer unfair prejudice from this newly revealed damages theory that is not unlike the unfair prejudice argued in their previous motion and confirmed by the court in its earlier order:

The claim was not alleged until December 31, 1997, years after discovery

9

was closed, and defendants did not have the opportunity to take discovery on this contention. Plaintiffs' speculation that, if they had thought KII could borrow more money, they would have held out successfully for another $120 per share, is not disclosed or supported in any prior witness testimony, expert report or calculation of damages. Obviously, defendants would never have agreed to pay $320 per share, regardless of what plaintiffs now claim they did not know, and to fairly defend against this attempt to recover extraordinary damages on a new theory would require extensive discovery, and additional expert witnesses in banking and finance. This cannot be allowed, consistent with fundamental fairness and the holding of this Court as stated in the Memorandum and Order of February 17, 1998.

(Dk. 688, p. 8). Finally, the defendants point out that this Rule 10b-5 theory of damages would not apply to the plaintiffs' accounting claim which is brought only on theories of breach of warranty and breach of fiduciary duty.

In response, the plaintiffs emphasize that the parties' proposed pretrial order in 1993 included the damages claim for what "the selling shareholders would have obtained in knowledgeable negotiations with KII for the sale of their stock," and that the defendants made no objection in 1993 to this particular language. After the summary judgment ruling, the plaintiffs waited to submit their new itemization until after their damages expert had finished his adjustments required by that ruling. In their new itemization, plaintiffs added the allegations that they would have obtained "at least $120 per share in knowledgeable negotiations" and that "Defendants' misrepresentations and omissions induced plaintiffs to underestimate KII's cash flow and its ability to borrow and repay debt for purchasing plaintiffs' stock." (Dk. 676, p. 9). The

10

plaintiffs say this new language simply elaborated on their alternative damage claim.

The plaintiffs procedurally object that the defendants' supplemental motion is untimely as the defendants' original motion never put in issue the plaintiffs' alternative damages claim. The plaintiffs further contend that the defendants waived any objection they might have made to the language found in the parties' pretrial order filed in 1993. As for the defendants' argument that this damages claim did not appear until after discovery closed, the plaintiffs argue that "[i]f defendants had wanted to know the nature, or even the details of plaintiffs' damage claim before the close of discovery, they could have served a contention interrogatory with respect to damages." (Dk. 703, p. 7). The plaintiffs maintain the defendants' claimed reliance on the plaintiffs' damages expert's report is not reasonable, for the plaintiffs are not required to prove their damages through an expert witness. Moreover, the plaintiffs insist it "was plain on the face" of their 1993 statement in the pretrial order that the first alternative damage claim was addressed by expert testimony and that the second alternative damage claim was not addressed. The plaintiffs further object that the defendants' motion in limine does not qualify as a timely supplemental motion, because it does not address matters which could not have been foreseen at the time for filing the original motions in limine.

The plaintiffs argue the additional language elaborating on their

11

second alternative damage claim does not add any new claim or elements of damages. The additional language merely fleshes out what the plaintiffs have generally alleged since the 1993 draft of the pretrial order. Even without the addition, the plaintiffs say that a liberal construction of the language used in the 1993 draft of the pretrial order would have entitled them to present their damages under the cash flow method to the jury.

On the legal validity of their alternative damage claim, the plaintiffs accuse the defendants of clouding the issue with a "false dichotomy between the concepts of 'fair value' and 'what the seller would have received with full information.'" (Dk. 703, p. 12). Cases that describe the Rule 10b-5 out-of-pocket measure of damages with terms like "value," "true value," or "actual value" are, in the plaintiffs' opinion, simply restating the same measure of damages pronounced in *Affiliated Ute*. The plaintiffs assert their position in this way:

> Defendants misunderstand plaintiffs' claims if they truly believe that the claim for damages based on the sales price plaintiffs would actually have negotiated "is for an amount **greater than** the actual or fair value of their stock." (Def. Sup. Mot. 5) (emphasis in original). This is not true. Plaintiffs do not contend that they could have negotiated a sales price in excess of the fair value of their stock. Plaintiffs contend the price they would have negotiated, with full and accurate information, would have been a *measure* of the fair value of their stock, including an appropriate premium reflecting the fact that plaintiffs sold a substantial percentage of Koch Industries' stock and ended a long-standing controversy regarding control of the company. Plaintiffs may be able to prove greater damages under this theory than by resort to a "fair market value" approach. That is not because plaintiffs are seeking more than

12

"fair value" under this theory **but simply because different valuation methods sometimes yield different numbers** and, in any event, plaintiffs lost part of their fair-market-value damages on procedural grounds.

Plaintiffs' alternative claims for damages measured by the fair market value of the stock sold and the price they would have received in knowledgeable negotiations both seek to measure plaintiffs' 'out-of-pocket' loss. Neither of them represents either a recissionary or an unjust enrichment measure of damages, for each is based on an assumption (or finding) that the plaintiffs would have still sold their stock.

Permitting plaintiffs to establish the amount of their out-of-pocket damages under these alternative modes of proof is not contrary to law. In fact, both of these measures were articulated in *Myzel v. Fields*, 386 F.2d 718 (8th Cir. 1967), *cert. denied*, 390 U.S. 951 (1968), one of the leading cases concerning the measure of damages in actions brought under Rule 10b-5.

(Dk. 703, pp. 14-15) (emphasis added). The plaintiffs insist a measure of

damages based on what they would have obtained in knowledgeable negotiations

is not speculative. Finally, the plaintiffs argue the measure of damages under

Rule 10b-5 is substantially similar to those for breach of warranty and breach of

fiduciary duty.

In reply, the defendants emphatically argue that the plaintiffs'

explanation of their alternative damage claim reveals a "totally new claim

alleging that defendants' 1983 Profit Plan misrepresented cash flow to the

plaintiffs." (Dk. 710, pp. 1-2). "Plaintiffs have never before alleged that the

Profit Plan was false. No testimony along these lines has ever been given, and

despite all of the briefs and arguments made in this case over the past 13 years,

not even a hint of this allegation has ever been made." (Dk. 710, p. 3). Just as

emphatically, the defendants argue that the plaintiffs' alternative damage claim

13

depends on yet another new allegation of an alleged omission made by the

defendants:

> On page 13 of their February 20 brief, plaintiffs allege "What defendants knew, but not the plaintiffs, was the level of capital expenditure required to 'maintain' the current earnings level, as opposed to the higher levels of investment that could be undertaken to expand the business." In other words, plaintiffs are now saying that defendants should have known that plaintiffs were doing a cash flow projection and, even though not requested, defendants had a duty to furnish a number for capital expenditures to be used for that purpose. Not only is this a totally new allegation, it is predicated on an assumed duty that has no foundation in the record or the pleadings in this case. Plaintiffs have never asserted that the defendants had a duty to anticipate that plaintiffs would be running a cash flow analysis on an assumption that entailed capital expenditures on the mystical level of "staying even." In fact, the record is clear that in 1982-83, plaintiffs refused to disclose to the defendants or Koch's investment banker any of their assumptions or methodologies. For plaintiffs to now inject in this case a theory that is predicated on just the opposite scenario is preposterous.

(Dk. 710, pp. 4-5). The defendants see the prejudice to them from this new

alleged omission as obvious:

> No discovery has been taken as to the meaning, interpretation or use of KII's 1983 Profit Plan. No questions have been asked to test plaintiffs' present assertions that capital expenditures are often predicted by using last year's depreciation; that $10 million in cash flows adds $10 per share to the price; that cash flow should be computed by averaging two years income; that defendants had a duty to speculate and give to the plaintiffs what capital expenditures would be required just to stay even; etc.

*Id.* at 6. The defendants devote several pages of argument that the plaintiffs'

alternative damages claim is not an out-of-pocket measure of fair value; rather, it

is a measure of recissional damages based on the notion that the plaintiffs would

have retained the stock until the higher price gained by the wrongdoer was

14

reached.

To their motion for leave to file a sur-reply, the plaintiffs attach their brief in which they refute the defendants' allegation that they are advancing a "new fraud claim" under their damages by the cash flow method. As part of their claim that they underestimated KII's cash flow in 1983, the plaintiffs allege that their investment banker "Bain used higher earnings numbers than the 1983 Plan, *and* higher depreciation, because it averaged the 1982 Actual with the 1983 Plan (both numbers as reported in the March 4, 1983 Directors Blue Book)." (Dk. 712, p. 6). The plaintiffs emphasize that the 1983 Plan was presented to them in the "Directors Blue Book" for the March 1983 Board of Directors meeting and that the numbers in the 1983 Plan were a central topic of discussion at the meeting. This discussion, according to the plaintiffs, was the "setting" for some of the misrepresentations alleged in the pretrial order under the plaintiffs' Pine Bend Refinery claim. In pertinent part, the plaintiffs contend:

> In short, these meetings focused directly on defendants' financial projections in the 1983 Plan versus the company's actual 1982 results. The 1983 Plan lay at the core of the pleaded fraud, because those were the projections being talked about at the March 5, 1983 Board meeting where the misrepresentations occurred.
>
> Similarly, the misstated refinery capacity and non-recurring write-offs pleaded in this case **relate directly** to the 1983 Plan and the cash-flow damages. The 1983 Plan projections given to plaintiffs supposedly estimated the earnings of the Pine Bend Refinery based on the productive capacity of that facility, as well as the defendants' knowledge of the refinery's health and competitive prospects. . . .
>
> Plaintiffs reasonably believed that the 1983 Plan reflected the earnings of a 127,300 b/d refinery in a collapsing market. This is what

15

they were told. In fact, as defendants knew, the true prospects for 1983 were those of a 145,000 b/d refinery, soon to reach 155,000 b/d during 1983, in a protected Northern market and with an expanding Southern market resulting from the Williams Pipeline reversal. How can defendants now say that the 1983 Profit Plan was unrelated to the Pine Bend fraud? . . .

The accounting claim, based upon defendants' misrepresentation of non-recurring 1982 writedowns as recurring expenses, also bears directly on the 1983 Plan. The 1983 Plan said the company would incur $179 million of depreciation charges for the year. (*See* Exhibit A) This was plausible to plaintiffs, because the total depreciation charges for 1982 had been even higher, and Charles Koch told them on March 5, 1983 that the market was "starting to fall so greatly" that the company's assets are deteriorating considerably." (Pretrial Order at 7) How more explicitly could Charles Koch have said that the writedowns and depreciation were going to continue in 1983 and the coming years?

(Dk. 712, pp. 4-6) (emphasis added). The plaintiffs believe the defendants'

duties under the warranties and under the law of fiduciaries obligated them to

consider how their statements would affect the plaintiffs' cash-flow calculations.

## ANALYSIS

From the arguments summarized above and the analysis to follow,

it should be obvious that the issues here are some of the more difficult ones to

have been addressed in this complex litigation. The court literally has spent days

untangling the parties' knotty arguments and immersing itself in the murky

waters of Rule 10b-5 damages. Were its time and attention not also required for

other equally important matters in preparing for this trial and overseeing its

docket, the court would reduce more of its research and analysis to writing.

What follows then is the court's ruling and a distillation of its research efforts.

16

## Procedural Objections

Though numerous and varied, the plaintiffs' procedural objections can be reduced to two central complaints. The defendants' motion is untimely and exceeds the proper scope of a supplemental motion to strike or a supplemental motion in limine. The defendants waived any objection to the plaintiffs' second damage claim by not objecting to this language as it first appeared in the 1993 draft of the parties' proposed pretrial order and by not serving a contentions interrogatory on the plaintiffs' damages. Though having some merit, these procedural objections do not prevent the defendants' motion from getting out of the starting gate.

At the status conference on February 9, 1998, the defendants' counsel orally argued most, if not all, of the points now being advanced in the motion and memoranda. When it asked for memoranda, the court did not elicit from the parties, or characterize on its own, the procedural posture for submitting them. At the time, the court understood the defendants believed that they had challenged the plaintiffs' second damage claim in their original motion to strike. The court similarly understood the defendants would be disputing in their memoranda what had been discussed at the conference, that is, the plaintiffs' recent "clarification" of its second damage claim as so stated in the plaintiffs' itemization of damages and as argued by the plaintiffs' counsel during the status conference. The defendants' memoranda address what the court

17

anticipated as well as those matters which logically follow from those issues and from what the plaintiffs continue to reveal as their second or alternative damages claim. In these circumstances, the court will not reject the defendants' memoranda on procedural grounds and, thus, overrules the plaintiffs' objections to the defendants' supplemental motion on untimeliness and improper scope.

The plaintiffs' arguments for waiver are more forceful but still not prevailing. The court recalls it too was confused when it received the parties' 1993 draft of the pretrial order and read the plaintiffs' damage claim for "the incremental amount . . . that the selling shareholders would have obtained in knowledgeable negotiations with KII for the sale of their stock, *whichever is greater.*" (Italics added). Before it received the plaintiffs' most recent itemization of damages, the court occasionally pondered what additional damages the plaintiffs contemplated as included within this alternative theory. The court considered that it was not aware of any claim for recissional relief or any allegation that the defendants had failed to disclose material facts concerning a likely post-sale event which would have affected the fair value of the shares sold. The court also remembered that the plaintiffs' damage theories had been the subject of earlier discovery-related orders. In one such order, the court recounted that it had asked the plaintiffs to "explain their damage theories, the legal support for them, and the amount of damages they expect would be revealed through additional discovery." *Koch v. Koch Industries, Inc.*, 1993 WL

18

23738, at *1 (D. Kan. Jan. 6, 1993). The court observed in that order:

> The plaintiffs eschewed committing themselves to any specifics on their damage theories and offered only the most general and obvious statement of damage theories. The case law cited did not directly support the propositions and did not shed much light on what the plaintiffs considered their damage theories to encompass.

*Id.* at *6. Consequently, up through December of 1997, the court presumed that its confusion over the alternative damage claim and theory was not shared by the defendants and that both sides understood the theory and facts behind this damage claim. The court's presumption obviously was wrong.

Some of the blame for the misunderstanding rests with the defendants for never filing a contention interrogatory concerning the plaintiffs' damages. Indeed, contention interrogatories serve "'to narrow and define issues for trial and to enable the propounding party to determine the proof required to rebut the respondent's position.'" *Towner v. Med James, Inc.*, No. 94-2285-GTV, 1995 WL 477700, at *3 (D. Kan. Aug. 9, 1995) (quoting *Baltimore Therapeutic Equipment Co. v. Loredan Biomedical, Inc.*, No. 89-1085-GEB, 1993 WL 129781, at *16 (E.D. Cal. Feb. 19, 1993)). Still, as of September of 1992, in response to a direct request by the court, the plaintiffs were to have ostensibly disclosed and explained their damage theories along with their legal support for them. *Koch v. Koch Industries, Inc.*, 1993 WL 23738, at *1. In that disclosure, the plaintiffs never mentioned any claim or theory for damages by cash flow method based on what KII could afford to borrow and pay back from

19

its cash flows. Even though it would have been more prudent to have still served a contentions interrogatory on the plaintiffs, the defendants cannot be roundly criticized for not doing so when the plaintiffs had ostensibly disclosed their theories to the court as requested.

More of the blame for the misunderstanding rests with the plaintiffs' failure to plead this damages claim and theory in plain and specific terms before January 5, 1998. In the parties' 1993 proposed draft of the pretrial order,[4] the plaintiffs concealed their "damages by the cash flow method" in the allegation that they were entitled to recover an "incremental amount above $200/share . . . that the selling shareholders would have obtained in knowledgeable negotiations with KII for the sale of their stock." Unlike with the first damage claim, the plaintiffs attached no dollar figure to this claim or theory and did not even allude to the expected method of calculating these damages.

---

[4]The 1993 draft, in relevant part, provided:

Plaintiffs contend that the appropriate measure of damages is either (1) the difference between the price actually paid for their stock and the fair market value of KII stock sold on June 10, 1983, or (2) the incremental amount above $200/share (plus a share of the Santa Barbara offshore oil field) that the selling shareholders would have obtained in knowledgeable negotiations with KII for the sale of their stock, whichever is greater. In the event that the Court allows inquiry into KII's post 1985 financial condition, plaintiffs reserve the right to claim the benefit KII derived from fraudulently inducing the selling shareholders to sell.

The fair market value of KII's hidden or misstated assets and earnings at June 1983 was at least $83 per share (i.e. incremental value above the sale price). The derivation of this number is detailed in Patricof & Co.'s "Updated Report on Damages" (Nov. 4, 1992).

20

They did allege in the second paragraph that "[t]he fair market value of KII's hidden or misstated assets and earnings at June 1983 was at least $83 per share (i.e. incremental value above the sale price)." This parenthetical language ostensibly parallels the plaintiffs' second damage allegation of an "incremental amount above $200/share theory."[5] Suffice it to say, the plaintiffs' allegations concerning the second damage claim in its itemization of damages in the 1993 draft of the pretrial order were so cursory, incomplete and ambiguous that the court will not bar the defendants from challenging them now.

## Rule 10b-5 Damages

Anyone researching the issue of Rule 10b-5 damages would be immediately confronted with the repeated observation that this is a confused area of the law where the courts, forced to rely on their own wits, have crafted a myriad of approaches.[6] *See DCD Programs, Ltd. v. Leighton*, 90 F.3d 1442,

---

[5]This parenthetical language may explain in part the misunderstanding. The defendants apparently read the plaintiffs' alternative damage claim in the 1993 draft as also covered by the expert's report and as alleged to address those damages based on a control premium. This is not an implausible or unreasonable reading of the plaintiffs' 1993 itemization of damages.

[6]Commentators almost universally agree on this observation. *See* 3B Harold S. Bloomenthal & Samuel Wolff, *Securities and Federal Corporate Law* § 9.49[1] (1989); IX Louis Loss & Joel Seligman, *Securities Regulation* p. 4410 (1992); Andrew L. Merritt, *A Consistent Model of Loss Causation in Securities Fraud Litigation: Suiting the Remedy to the Wrong*, 66 Tex. L. Rev. 469, 469-70 (1988); One commentator summed up the situation quite astutely in this court's opinion:

The measure of recovery in a Rule 10b-5 action always has been

21

1446 (9th Cir. 1996). Section 28 of the Securities Exchange Act limits recovery

to "actual damages on account of the act complained of." 15 U.S.C. § 78bb.

Because Congress left "actual damages" undefined, "it is the duty of the courts to

be alert to provide such remedies as are necessary to make effective [the]

congressional purpose" behind the securities statutes. *J. I. Case v. Borak*, 377

U.S. 426, 433 (1964); *see Hackbart v. Holmes*, 675 F.2d 1114, 1121 (10th Cir.

1982) (Trial court has discretion to fashion "a remedy to suit the particular

case."). "[C]ourts have interpreted the statute as permitting all forms of loss-

based relief, whether articulated under out-of-pocket[7], benefit-of-the-bargain[8], or

---

confusing. Not coincidentally, it always has been an afterthought in Rule
10b-5 case law. Litigants seeking to establish the existence and then the
elements of a private cause of action under Rule 10b-5 were content to
leave the measure of recovery to be resolved another day. In almost all
cases "another day" never came as cases settled without the need to
precisely define the measure of recovery. In those cases where the courts
have been forced to state a measure, they have provided a bewildering
mix of standards, often using the same terms, but frequently giving them
radically different interpretations and doing little to resolve the
inconsistencies. For those cases that made it to the end, judges seemed
more partial to providing rough justice than to establishing a clean
theoretical formula for recovery.
Robert B. Thompson, *"Simplicity and Certainty" in the Measure of Recovery
under Rule 10b-5* 51 Bus. Law 1177, 1179 (1996).

[7]"'Out-of-pocket' is a commonly used legal term, usually asserted as a
means to describe harm to the plaintiff caused by the fraud. It purports to
provide recovery only for damage due to the fraud, excluding damage from any
other source." Thompson, *Simplicity and Certainty*, 51 Bus. Law. at 1181. The
out-of-pocket method is concerned with the loss sustained and measures it as the
"'difference between value of what [the victim] has parted with and value of
what he has received.'" *United States v. Gennuso*, 967 F.2d 1460, 1462 (10th

22

other loss theories." *Panos v. Island Gem Enterprises, Ltd., N.V.*, 880 F. Supp.

169, 175 (S.D.N.Y. 1995); *see Sowell v. Butcher & Singer, Inc.*, 926 F.2d 289,

---

Cir. 1992) (quoting W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* §110, at 767 (5th ed. 1984)). Consistent with tort principles, the out-of-pocket method measures on the date of the transaction and excludes losses based on subsequent market changes or based on what the plaintiff might have gained if the defendant had performed as promised. Robert B. Thompson, *The Measure of Recovery Under Rule 10b-5: A Restitution Alternative to Tort Damages*, 37 Vand. L. Rev. 349, 357-58 (1984); *see Estate Counseling Service v. Merrill Lynch, Pierce, Etc.*, 303 F.2d 527, 533 (10th Cir. 1962).

[8]The benefit-of-the-bargain method gives the plaintiff the benefit of what was promised him by measuring damages as "'the difference between the actual value of what [the victim] has received and the value that it would have had if it had been as represented.'" *United States v. Gennuso*, 967 F.2d at 1462 (quoting W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 110 at 768). In Rule 10b-5 cases, "[g]enerally, the federal courts have rejected the benefit-of-the-bargain measure, due to statutory interpretation, history, and policy considerations." Ronald B. Lee, *The Measure of Damages Under Section 10(b) and Rule 10b-5* 46 Md. L. Rev. 1266, 1274-75 (1987). In an early case, the Tenth Circuit held that benefit-of-the-bargain damages are not recoverable under 10b-5, relying on the Supreme Court decision of *Smith v. Bolles*, 132 U.S. 125, 130 (1889). *Estate Counseling Service v. Merrill Lynch, Pierce, Etc.*, 303 F.2d 527, 533 (10th Cir. 1962). Some courts have allowed such damages in "unusual circumstances." Thompson, *A Restitution Alternative*, 37 Vand. L. Rev. at 359 n.31; *see Pelletier v. Stuart-James Co., Inc.*, 863 F.2d 1550, 1558 (11th Cir. 1989). Those courts have been careful to limit benefit-of-the-bargain damages in a Rule 10b-5 action as being available only when "they can be calculated with reasonable certainty." *See Commercial Union Assur. Co., PLC v. Milken*, 17 F.3d 608, 615 (2nd Cir.), *cert. denied*, 513 U.S. 873 (1994) (citations omitted). "For example, in *Barrows v. Forest Labs., Inc.*, 742 F.2d 54, 59-60 (2nd Cir. 1984), we refused to allow benefit-of-the bargain damages where such damages were based on the speculation of what plaintiffs' securities would have been worth if the company had disclosed its true financial forecast." *McMahan & Co. v. Wherehouse Entertainment, Inc.*, 65 F.3d 1044, 1049-50 (2nd Cir. 1995), *cert. denied*, 116 S. Ct. 1678 (1996).

297 (3rd Cir. 1991). In sum, courts routinely understand "actual damages" to be
out-of-pocket losses, *Anixter v. Home-Stake Production Co.*, 977 F.2d 1549,
1553 (10th Cir. 1992), *cert. denied*, 507 U.S. 1029 (1993); *Astor Chauffeured
Limousine Co. v. Runnfeldt Inv. Corp.*, 910 F.2d 1540, 1551-52 (7th Cir. 1990);
*Garnatz v. Stifel, Nicolaus & Co., Inc.*, 559 F.2d 1357, 1360 (8th Cir. 1977),
*cert. denied*, 435 U.S. 951 (1978), but they have varied that measure or looked to
other measures when the facts required it, *Pelletier v. Stuart-James Co., Inc.*, 863
F.2d 1550, 1557-58 (11th Cir. 1989); *Garnatz*, 559 F.2d at 1360; *see Hackbart*,
675 F.2d at 1121.

        In *Affiliated Ute Citizens*, the Supreme Court said the correct
measure under this section was "the difference between the fair value of all that
the . . . seller received and the fair value of what he would have received had
there been no fraudulent conduct."  406 U.S. at 155.[9]  The plaintiffs read what
the seller "would have received had there been no fraudulent conduct" as the
"heart" of the rule and demote "fair value" to mere nomenclature. The plaintiffs
equate this rule with the second measure of damages in *Myzel* where the court
upheld a jury instruction that a defrauded seller could obtain a "greater amount"

---

    [9]The Supreme Court followed this same rule in *Randall v. Loftsgaarden*,
478 U.S. 647, 661-62 (1986).  The Tenth Circuit has stated the same rule in its
10b-5 decisions. *Anixter v. Home-Stake Production Co.*, 977 F.2d 1549, 1553
(10th Cir. 1992), *cert. denied*, 507 U.S. 1029 (1993); *Feldman v. Pioneer
Petroleum, Inc.*, 813 F.2d 296, 301-02 (10th Cir.), *cert. denied*, 484 U.S. 954
(1987).

24

or "higher amount" than the actual value of the stock at the time of sale if the jury found that upon full disclosure the sellers would have held out for a higher selling price from the defendants. *Myzel*, 386 F.2d at 744 n.23, 745. The court disagrees with the plaintiffs' spin on *Affiliated Ute* and *Myzel* and their efforts to apply the same here.

The facts in *Affiliated Ute* are important in understanding the general rule that is stated there. The Rule 10b-5 action arose when employees of a bank that served as the transfer agent to the plaintiffs' association purchased shares of stock from the plaintiffs at prices ranging between $300 and $700 per share. Finding liability, the district court arrived at a value of $1500 per share after considering a complex series of factors and awarded damages based on that value. The factors considered by the district court included the value of the underlying assets, actual sales prices, opinion evidence on worth, and other market-influencing circumstances which incorporated the court's finding "that some portion of the depressant factors in the market was attributable to the defendants." 406 U.S. at 156. On appeal, the Tenth Circuit held that the district court erred in valuing the shares and that the proper "measure was 'the profit made by the defendant on resale' or, if no resale was made or if the resale was not at arm's length, was 'the prevailing market price at the time of the purchase from the plaintiffs.'" 406 U.S. at 154 (quoting *Reyos v. United States*, 431 F.2d 1337, 1348-49 (10th Cir. 1970)). The Supreme Court reconciled these two

25

approaches in favor of the plaintiffs. It found that the plaintiffs could receive either the district court's approach, that is, the difference between the fair value they received and the fair value they would have received absent the fraud, or the circuit court's approach, that is, the defendants' profit if it was greater than the other amount of damages. 406 U.S. at 155.

As to the district court's fair value approach, the Supreme Court agreed with the district court and the circuit court that the plaintiffs' requested value of $28,000 per share, "a figure concededly dependent in large part on an estimate of the ultimate worth of oil shale," was "unrealistic and speculative." 406 U.S. at 155. Citing in part, *O'Malley v. Ames*, 197 F.2d 256 (8th Cir. 1952), the Court next recognized that a factfinder in valuing shares "is not restricted to actual sale prices in a market so isolated and so thin as this one." 406 U.S. at 155. In the *O'Malley* case, the court had defined "fair market value" as "the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy nor to sell and both being informed." 197 F.2d at 257 (citation omitted). The *O'Malley* court also said that in the absence of actual sales, the trier of fact should "consider all circumstances connected with the corporation in determining its fair market value." *Id.* at 258 (citation omitted).

Thus, the Supreme Court approved the district court's multi-factored approach which blended actual sale prices along with other factors in

26

arriving at a figure that represented the "worth" of the shares. 406 U.S. at 155-56. In addition, the Supreme Court indicated that a factfinder in calculating fair value should begin with actual sales prices when available and when the sales occurred in an open and well-developed market, and if no such market exists then resort to a discretionary balancing of all factors relevant in valuing shares. *See* Michael J. Kaufman, *No Foul, No Harm: The Real Measure of Damages Under Rule 10b-5*, 39 Cath. U.L. Rev. 29, 40-41 (1989). Finally, the Supreme Court found "sufficient support in the record" for the district court's valuation that "the stock was worth $1,500 per share at the times of the petitioners' respective sales." 406 U.S. at 156. In sum, what the defrauded sellers in *Affiliated Ute* would have obtained in the absence of fraud[10] was what the shares were actually worth at the times of the different sales as determined by an accepted valuation approach that did not rely exclusively on actual sales prices because the market was isolated and thin.

Though citing *Myzel*,[11] the Supreme Court in *Affiliated Ute* does

---

[10]The alleged fraud here was that the defendants had failed to disclose that they were the "market makers" for the sales, that the defendants were in a position to profit from the sales, and that shares were selling for a higher price in that market. 406 U.S. at 153.

[11]It should be noted that the Supreme Court cited page 748 of the *Myzel* opinion which summarizes the general rule of out-of-pocket damages under Rule 10b-5. It is on page 749 where the Eighth Circuit discusses damages on a finding that the plaintiffs "would have retained the stock until the higher price gained by wrongdoer was reached." 386 F.2d at 748-49. In addition, the court

27

not appear to recognize a measure of damages that is based on anything other than the fair or actual value of the shares sold, except "where the defendant receives more than the seller's **actual loss.**" 406 U.S. at 155 (emphasis added). If its intent were to depart from the traditional out-of-pocket rule that measures the difference between the price paid and the actual value of the share received, the Supreme Court never said as much.[12] In applying the rule as stated, the Court in *Affiliated Ute* did not even discuss what selling price that the plaintiffs might have obtained from knowledgeable negotiations with the defendants; rather, it focused on the actual value of the shares on the sale dates. So, what are we to

---

believes the *Myzel* decision should be read as considering the second alternative damage calculation in that jury instruction as not a true out-of-pocket measure but as either a recissional measure allowing an award based on the difference between the share's selling price and its highest intermediate value within a reasonable time period after the sale, Kaufman, *No Foul, No Harm*, 39 Cath. U.L. Rev. at 120, or some hybrid approach with restitution overtones, Thompson, *A Restitution Alternative*, 37 Vand. L. Rev. at 361-63. *See Myzel*, 386 F.2d at 745-47. The plaintiffs' effort to read the second damage calculation as an alternative method to calculate "fair value" or "actual value" is plainly contradicted by the Eighth Circuit's description of the three measures. *Myzel*, 386 F.2d at 744-45. The court explained that only the first measure is concerned with the "actual value of the stock when sold" or the traditional out-of-pocket measure of damages. *Id.* at 745.

[12]In fact, Justice Blackmun, who wrote the *Affiliated Ute* opinion, explained in his concurring opinion in *Randall v. Loftsgaarden*, 478 U.S. 647, 668 (1986): "Normally, however, the proper measure of damages in a § 10(b) case is an investor's out-of-pocket loss, that is, 'the difference between the fair value of all that [the plaintiff] received and the fair value of what he would have received had there been no fraudulent conduct.' *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 155 (1972)."

28

make of the Supreme Court's phrasing of this traditional rule? One commentator

offers:

> The alternatives [the traditional phrasing of the out-of-pocket rule and the
> Supreme Court's phrasing of the rule] theoretically could produce
> different recoveries but courts have not placed any significance on the
> difference in wording. The alternative phrasing probably reflects the
> court's intention to limit plaintiffs' damages to the harm that is
> proximately related to the fraud. The difference can be illustrated with an
> example from Dobbs. Plaintiff paid $25,000 for a house that defendant
> represented to be termite free. The plaintiff made a bad bargain because
> even termite free the house was worth only $22,000. Because the house
> had termites, its actual value was only $19,000. If the measure of
> damages is the difference between what the plaintiff received ($19,000)
> and what he paid ($25,000), plaintiff can collect $6,000. If the measure is
> the difference between what he received ($19,000) and what he would
> have obtained had the representation been true ($22,000), plaintiff is
> made "whole" for the fraud but is still stuck with the bad bargain.
> (citation omitted).

Robert B. Thompson, *The Measure of Recovery Under Rule 10b-5: A*

*Restitution Alternative to Tort Damages*, 37 Vand. L. Rev. 349, 398 n.22 (1984).

Stated another way, the rule insures that the proper measure of damages rests

"upon a quantification of the materiality of the defendants' nondisclosures."

Kaufman, *No Foul, No Harm*, 39 Cath. U.L. Rev. at 42. In other words, the

Supreme Court's phrasing appears best interpreted as limiting recoverable

damages to those proximately caused by the misrepresentations or

nondisclosures. The court is confident that the general rule as stated in *Affiliated*

*Ute* was never intended to permit a situation where the defrauded seller could

obtain more than the actual, true or fair value of the shares, except "where the

29

defendant receives more than the seller's **actual loss**." 406 U.S. at 155
(emphasis added).

The plaintiffs deny that their damages by the cash flow method is
based on any other legal theory than out-of-pocket loss. The plaintiffs further
deny that they seek damages greater than the actual or fair value of their stock.
The plaintiffs contend that their damages by the cash flow method is simply an
alternative method of calculating the fair or actual value of the shares. The
plaintiffs' contention, however, is belied by their very own description of this
damages method and their use of it. "For an LBO analysis, the focal question
was not the abstract issue of 'what the stock is worth' but rather, what the
company, as a buyer, could afford to borrow and pay back from its cash flows."
(Plaintiffs' brief on damage claims, Dk. 690, p. 10). Indeed, the plaintiffs offer
no authorities for the proposition that whatever a buyer can afford to borrow and
pay back from its cash flows is a recognized and appropriate method of
determining the actual or fair value of shares for purposes of a legitimate and
lawful sale of shares under the circumstances as they existed in June of 1983.
Nor has the court found any in its research of the topic. Indeed, the only way
that the plaintiffs even link this method to stock value is that they calculated
what they believed KII could afford to pay and that these calculations influenced
their negotiations with the defendants. Which brings us full circle, the plaintiffs
consider this method to be a measure of fair value because they believe it is what

30

the plaintiffs would have obtained in knowledgeable negotiations with the defendants. For the reasons stated earlier, the court rejects any attempt to read the rule in *Affiliated Ute* as permitting a defrauded seller to recover not just those damages related to the stock's actual value or worth but an additional amount based on whatever he believes he could have obtained from knowledgeable negotiations.

The court believes the rule as stated in *Affiliated Ute* allows the plaintiffs here to recover only their "actual loss," that is, the difference between the "fair value" of their stock on the day of the sale and the price paid them. What then is "fair value?" It is the result of any recognized valid method for determining the worth of shares. In addition, the value may be adjusted to reflect certain circumstances in a sale that justify a premium or discount. It seems both reasonable and logical that the determination of an appropriate control premium adjustment would entail considering any number of factors including, whether the sale ends a long-standing controversy over control of the company, whether the sale involves a substantial percentage of the corporation's stock, whether the sale would give the buyers the certainty of ongoing control, and whether the buyers could afford to pay a substantial premium.

With all that said, the court still appreciates its discretion to craft appropriate Rule 10b-5 remedies as limited by the theories that have been pleaded. What the plaintiffs are really urging as their alternative damage claim

31

is that they expected in 1983 to be paid a selling price which was a little less than what KII could afford to pay and that this same expectation entitles them to receive damages equal to a selling price in the same proportion to KII's actual ability to pay as what they were able to negotiate in 1983 based on KII's apparent ability to pay. Of course, the plaintiffs deny having alleged any damage theories other than out-of-pocket loss and unjust enrichment or disgorgement of profits. In this case, neither theory[13] supports an award of damages based on an unexpressed and undisclosed expectation, not a right, to receive a selling price that was a little less than the buyer's actual ability to pay. It is true that the plaintiffs may recover damages for the benefit-of-the-bargain under one or all of their common-law claims. The plaintiffs, however, have not alleged any claim that their expectation ever was part of the SPA or that KII had a duty to disclose its ability to borrow money for purposes of purchasing their stock and failed to do so. The Second Circuit has observed:

> The concept of recovery of damages for a benefit-of-bargain is founded on the agreement made, not on a proposed hypothetical agreement built on outside evidence and on speculation regarding what the parties might have done or received had the circumstances surrounding the agreement been different.

---

[13]The plaintiffs offer nothing to show that they had any right to receive all or just a little less than what KII could afford to pay them. Without such a right, they suffered no actual loss. *See Hackbart v. Holmes*, 675 F.2d at 1121-22. The plaintiffs have made no attempt to prove they are entitled to this method of damages under the disgorgement of profits or unjust enrichment theory.

*Commercial Union Assur. Co., PLC v. Milken*, 17 F.3d 608, 615 (2nd Cir.), *cert. denied*, 513 U.S. 873 (1994). In sum, the plaintiffs do not present any theory, and the court is unaware of any, which would allow a defrauded seller, who negotiated a sales price for his shares based on his own undisclosed method (what the buyer could afford to borrow and pay back from its cash flows) which was never made part of any agreement between the parties and never the express subject of any requested disclosures or related omissions, to recover in excess of the shares' fair value those damages calculated by this undisclosed, unilateral method.

Even if the court were to recognize one or more of the plaintiffs' legal theories as permitting this damages by the cash flow method, the court would still bar the plaintiffs from presenting it as a separate measure of damages in the manner it has been alleged and explained in the plaintiffs' briefs. The plaintiffs couch this method of damages in part on misrepresentations that are not claims in this case. The court will not allow the plaintiffs to add alleged omissions and misrepresentations under the guise of a damage theory that is only now being explained.

The plaintiffs allege that their advisers calculated KII's cash flow and relied in part on numbers from the 1983 Profit Plan and that the "[d]efendants knew that the numbers they gave to the plaintiffs in the Spring of 1983 were wrong." (Dk. 690, p. 12). The court finds no allegation in the

33

pretrial order that the numbers in 1983 Profit Plan were false.[14]  According to the defendants, the plaintiffs have never made this allegation or submitted testimony in support of such a proposition.

The plaintiffs respond that the falsity of the 1983 Profit Plan is "related" to their existing Pine Bend claim.  (Dk. 712).  The offered relationship is that the 1983 Profit Plan was presented to the plaintiffs and discussed at the same March 1983 meeting that the defendants made certain verbal misrepresentations about KII's refinery projections as have been alleged in the pretrial order.  In other words, the 1993 Profit Plan was part of the setting for the alleged false statements, and the falsity of the Profit Plan's numbers is akin to the fraud specifically alleged by the plaintiffs.  As for their accounting claim, the plaintiffs say the 1983 Profit Plan is related, because the 1983 projected depreciation charges were less than the 1982 depreciation charges.  Whatever the relationship between the Profit Plan and the plaintiffs' existing claims, it does not overcome the defendants' point that plaintiffs have never alleged before their damages brief on February 20, 1998, that the defendants knew the 1983 Profit Plan numbers were false.  Nor does the plaintiffs' response minimize the unfair

---

[14]In the pretrial order, there is only one allegation that specifically refers to the 1983 Profit Plan.  Charles Koch allegedly said at the March 1983 meeting that "To make plans [would] require [a] recovery in refinery margins."  (Dk. 676, p. 6).  This allegation obviously does not assert that the 1983 Plan was false.

prejudice that would be suffered by the defendants if they were now forced to defend those numbers at trial.

The most significant difference between Milton Hall's calculations of cash flow for KII and the plaintiffs' advisers' calculations is the number assigned to capital expenditures needed to maintain KII's current earnings level. The plaintiffs allege that they relied on KII's recurring depreciation as reported in 1982 statement and 1983 Plan and that they believed future capital expenditures would be even greater than those reported amounts. In contrast, Milton Hall apparently did not rely on these reported depreciation figures in estimating the level of capital expenditures. The plaintiffs allege that "[w]hat defendants knew, but not the plaintiffs, was the level of capital expenditure required to 'maintain' the current earnings level, as opposed to the higher levels of investment that could be undertaken to expand the business." (Dk. 690, p. 14). In response to this allegation, the defendants contend:

> In other words, plaintiffs are now saying that defendants should have known that plaintiffs were doing a cash flow projection and, even though not requested, defendants had a duty to furnish a number for capital expenditures to be used for this purpose. Not only is this a totally new allegation, it is predicated on an assumed duty that has no foundation in the record or the pleadings in this case. Plaintiffs have never asserted that the defendants had a duty to anticipate that plaintiffs would be running a cash flow analysis on an assumption that entailed capital expenditures on the mystical level of 'staying even.' In fact, the record is clear that in 1982-83, plaintiffs refused to disclose to the defendants or Koch's investment banker any of their assumptions or methodologies.

(Dk. 710, p. 5). The plaintiffs make no effort to show that they alleged in the

pretrial order or anytime prior to their damages brief filed February 20, 1998, that the defendants had a duty to furnish numbers for capital expenditures to be used for this kind of cash flow analysis and that the defendants breached this duty. The plaintiffs counter that the defendants were fiduciaries and had warranted to provide any information that might affect stock valuation. These general allegations do not provide any notice of a claim based on a duty to provide all information necessary for the plaintiffs' LBO/cash flow analysis.

The plaintiffs never effectively respond to the defendants' points of unfair prejudice if this damages by the cash flow method were presented at trial. The defendants say there has been no discovery on the meaning, interpretation or use of the 1983 Profit Plan. They further deny any opportunity to test the plaintiffs' assertions that capital expenditures are often predicted by using last year's depreciation, that $10 million in KII's cash flows adds $10 per share to the price, that cash flow is to be computed by averaging income over two years, or that the defendants have a duty to disclose the level of capital expenditures needed to maintain current levels in the absence of any request for such information from the plaintiffs. The court believes the defendants would be unfairly prejudiced if the plaintiffs were allowed to present their damages by the cash flow method as a separate measure of damages.

For all of the reasons stated above, the court grants the defendants' motion to strike the challenged language from the pretrial order. The court also

36

grants in part the defendants' motion in limine. The parties shall not refer to the cash flow analysis method as a separate method for calculating the fair value of the shares sold or as a separate measure of damages. Moreover, the parties shall not allege or refer to any allegation that the numbers in the 1983 Profit Plan were false or that the defendants had a duty to disclose and failed to disclose the level of capital expenditures needed to maintain current levels of earnings. The court, however, is not ruling out the possibility that evidence concerning the plaintiffs' advisers' cash flow calculations may be relevant for other reasons, *e.g.*, as evidence supporting or as a factor in calculating damages based on an adjustment for a control premium.

IT IS THEREFORE ORDERED that the defendants' supplemental motion to strike new damage contention (Dk. 688) is granted and the motion in limine (Dk. 688) to exclude evidence thereon is granted in part; ·

IT IS FURTHER ORDERED that plaintiffs' motion for leave to file a sur-reply (Dk. 712) is granted.

Dated this 2 day of April, 1998, Topeka, Kansas.

Sam A. Crow, U.S. District Senior Judge

37