ENTERED ON THE DOCKET
DATE: 7 | 8 | 9 8

FILED
U.S. DISTRICT COURT
DISTRICT OF KANSAS

JUL 7  1 25 PM '98

RALPH L. DELOACH,
CLERK
BY B.I.  DEPUTY
AT TOPEKA, KS.

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS

WILLIAM I. KOCH, et al.,

        Plaintiffs,

Vs.                       No. 85-1636-SAC

KOCH INDUSTRIES, INC., et al.,

        Defendants.

## MEMORANDUM AND ORDER

The case comes before the court on a number of pending motions, including the parties' motions for judgment as a matter of law ("JMAL"). At the close of the defendants' case, the parties filed their respective JMAL motions. (Dks. 904, 905, 906, 907, 908, 909, 911 and 913). The parties argued the JMAL motions in chambers on Thursday, June 10, 1998, and the court took the motions under advisement. The court submitted all claims to the jury on June 17, 1998. The jury returned its verdict on June 19, 1998, finding that the plaintiffs were not entitled to recover on any of their claims and theories. The court issues the following as its ruling on the parties' JMAL motions. The court also takes this

934

opportunity to comment on several objections and proffered instructions raised at

the recent jury instruction conference, to explain its ruling on the plaintiffs'

motion to present rebuttal evidence, and to clarify the record on several other

matters.

## DEFENDANTS' MOTIONS FOR JUDGMENT AS A MATTER LAW

A court may grant a JMAL motion only when "a party has been

fully heard on an issue and there is no legally sufficient evidentiary basis for a

reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a)(1).

The Tenth Circuit reads this rule to mean that "a court may grant the motion

'only if the evidence points but one way and is susceptible to no reasonable

inferences which may support the opposing party's position.' " *Finley v. United*

*States*, 82 F.3d 966, 968 (10th Cir. 1996) (quoting *Q.E.R., Inc. v. Hickerson*,

880 F.2d 1178, 1180 (10th Cir. 1989)), *rev'd on other grounds*, 123 F.3d 1342

(10th Cir. 1997) (en banc). The court "must construe the evidence and

inferences most favorably to the non-moving party, and refrain from weighing

the evidence, passing on the credibility of witnesses, or substituting . . . [its]

judgment for that of the jury." *Magnum Foods, Inc. v. Continental Cas. Co.*, 36

F.3d 1491, 1502 (10th Cir. 1994) (citation omitted); *see Harolds Stores, Inc. v.*

*Dillard Department Stores*, 82 F.3d 1533, 1546 (10th Cir.), *cert. denied*, --- U.S.

----, 117 S. Ct. 297 (1996). On the other hand, judgment as a matter of law must

2

be granted if there is no legally sufficient evidentiary basis with respect to a claim or defense under the controlling law. *Harolds Stores, Inc.*, 82 F.3d at 1546-47. In order to deny judgment as a matter of law, the court must find more than merely "a scintilla of evidence" favoring the nonmovant, and the court must find that "evidence was before the jury upon which it could properly find against the movant." *Cooper v. Asplundh Tree Expert Co.*, 836 F.2d 1544, 1547 (10th Cir. 1988). Judgment as a matter of law is only proper when "the evidence so strongly supports an issue that reasonable minds could not differ." *Ryder v. City of Topeka*, 814 F.2d 1412, 1418 (10th Cir. 1987).

The court deferred ruling on the defendants' JMAL motions at the close of all evidence (Dks. 907, 908, 909, 911 and 913) and submitted all claims to the jury. The court followed "[t]he better practice" of not taking the case away from the jury in favor of deciding a motion for judgment notwithstanding the verdict after the jury's deliberations. *Cottam v. First Baptist Church of Boulder*, 756 F. Supp. 1433, 1439 (D. Colo. 1991), *aff'd*, 962 F.2d 17 (10th Cir. 1992) (Table); *see Garrett v. Barnes*, 961 F.2d 629, 632 (7th Cir. 1992); *Therrell v. Georgia Marble Holdings Corp.*, 960 F.2d 1555, 1569 (11th Cir. 1992); *Biodex Corp. v. Loredan Biomedical, Inc.*, 946 F.2d 850, 861-62 (Fed. Cir. 1991), *cert. denied*, 504 U.S. 980 (1992); *see, e.g., Anderson v. United Telephone Co. of Kansas*, 933 F.2d 1500, 1502 (10th Cir.), *cert. denied*, 502 U.S.

3

940 (1991); *Ware v. Unified School Dist. 492, Butler County, Kansas*, 881 F.2d
906, 915 (10th Cir. 1989) (J. Barrett, dissenting) ("'Even at the close of all the
evidence it may be desirable to refrain from directing a verdict though it would
be possible to do so. . . . If the jury agrees with the court's appraisal of the
evidence, and returns a verdict for the party who moved for a directed verdict,
the case is at an end. If the jury brings in a different verdict, the trial court can
grant judgment notwithstanding the verdict.'" (quoting Wright and Miller,
*Federal Practice and Procedure:  Civil* § 2533, p. 586)).  As the jury here has
agreed with the court's appraisal of the evidence, the case is at an end and the
defendants' JMAL motions are denied as moot.

As the time and occasion are now appropriate, the court offers a
few brief comments on its appraisal of the plaintiffs' case.  Had the summary
judgment record been the same as the trial record, none of the plaintiffs' claims
would have survived summary judgment.  The evidence fully established that the
plaintiffs knew beginning in 1976 and continuing up to the time of the stock sale
that Koch Industries, Inc. ("KII") had been discussing, considering and
modifying plans for expansion at Pine Bend Refinery and, in fact, had
implemented one or more stages of the modified plans and thereby increased
Pine Bend's refining capacity.  From the different written project studies and
other presentations to the Board of Directors over the years, the plaintiffs had

4

been told and were well aware of KII's expansion plans for Pine Bend. By reason of William Koch's knowledge and education in the field of chemical engineering, the plaintiffs necessarily understood that Pine Bend's capacity for processing crude would also continue to grow. William Koch demonstrated in his testimony a rather developed working knowledge of refineries that he eagerly called upon when it could be used to support his claims and that he selectively denied when it would have plainly undermined his allegations of not knowing Pine Bend's capacity and the defendants' plans for expansion.

His own notes from a Board meeting in March of 1982 reflect that William Koch had been told that KII considered the completion of the Wood River Pipeline to be the reliable source for crude supply needed to justify proceeding with expansion plans for Pine Bend. From the actual monthly crude runs for the fall of 1982, the plaintiffs learned that Pine Bend's calendar day capacity was at least 134,000 bpd. Based on the first quarter projections for 1983, the plaintiffs also knew that KII expected Pine Bend to continue processing 134,000 bpd. Both the actual runs and projected runs fully demonstrated to the plaintiffs, in particular William Koch with his knowledge of refineries, that Pine Bend's actual physical processing capacity in June of 1983 exceeded 134,000 bpd, that Pine Bend's stream day capacity was at or near 145,000 bpd in June of 1983, and that Pine Bend's capacity would continue to

5

increase with the additional changes and the major turnaround planned for 1983.

The plaintiffs' professed reasons for not knowing about the refinery expansion were neither logical nor credibly supported by the evidence. Instead, they essentially proved that the plaintiffs' did not consider any expansion at Pine Bend to be material to their valuation of the KII stock. Considering his knowledge and experience with project studies, the use of economic assumptions in such studies, the marketing of refinery products at KII and the history of expansion at Pine Bend, William Koch could not have reasonably believed from reading the different KII studies that Pine Bend's physical capacity would not increase beyond 130,000 bpd anytime soon. The trial record also shows that William Koch and the other plaintiffs must have known and understood that any restrictions on Pine Bend's direct sales territory would not prevent KII from aggressively capturing more of the local market share or from selling more product through exchange transactions. The plaintiffs for their own reasons chose to disbelieve the defendants when they said they would market the increased gasoline production in these ways. Likewise, the plaintiffs for their own reasons decided to ignore the higher actual crude runs in fall of 1982 and the projected crude runs in 1983, because they ostensibly chose to believe that "GCOS" (Greater Canadian Oil Sands) was the sole cause of the increased runs. The plaintiffs did not prove with any evidence of a persuasive

6

nature that their choices in this regard resulted from the defendants' conduct.

The uncontroverted evidence at trial was that the period just before the stock sale was one of declining prices for petroleum products with many refineries closing or thinking about closing. Everyone, including the defendants, was concerned whether Pine Bend could match the profit levels for the previous year unless prices and margins rebounded. Consequently, while understanding that KII was always working to improve Pine Bends' position in the market through the increased processing of cheaper and heavier Canadian crudes, the plaintiffs and their analysts still considered Pine Bend to be a risky investment under current and expected market conditions. For all of these reasons, the court believes the jury properly found that any alleged omissions or misrepresentations concerning expansion at Pine Bend Refinery were not material and that the plaintiffs were paid a price that was more than fair for their stock.

The serious flaws in the plaintiffs' accounting claim were revealed during trial. Milton Hall cogently and convincingly explained his reasons for preparing his list of extraordinary items and how he used this list to assist him in describing certain items on the financial statements that he believed were somewhat unusual or unique enough as to warrant some additional comments to management. That Hall had some other criteria other than "infrequently occurring" under "GAAP" (generally accepted accounting principles) for listing

7

these items is quite apparent considering that even the plaintiffs' own expert witness, Gary Gibbs, could not find a way to characterize several items on Hall's list as infrequently occurring. As for Gibbs' testimony for why eight items from Hall's list and the inventory write downs from Markel's list were infrequently occurring, the court found Gibbs' proffered opinion and reasoning to be strained at best and contrived in most instances. The court firmly believes the jury properly found that the items listed by Gibbs were not infrequently occurring under GAAP.

## JURY INSTRUCTIONS—PROFFERS AND OBJECTIONS

Initially, the court would like to reiterate some general points made during the instruction conference. The court favors instructions that objectively state the governing law and that leave argument for the counsel. The court likewise prefers instructions that are simple, direct, and complete. Of course, instructions must foremost be an accurate statement of the relevant law. What law is relevant depends on the legal theories pleaded. Consequently, when the plaintiffs plead six alternative legal theories of recovery on two different claims involving Pine Bend Refinery, simplicity must yield to accuracy. When parties and counsel have demonstrated a spirited inclination toward semantic games, concerns for accuracy become most critical. Finally, when there is substantial overlap between the legal theories with little evidence to justify different verdicts

8

on different theories, concerns over an inconsistent verdict become significant. As these comments and those to follow will demonstrate, the parties invited the complexity of these instructions, the confusing concepts, and the lengthy and detailed verdict form.

Grouping of the Plaintiffs--No. 15. Both sides objected to this instruction. The plaintiffs wanted an instruction and verdict form that only allowed the jury to treat the plaintiffs as "one for all, and all for one," except for the Texas plaintiffs on the fraud claims. The defendants agreed to the extent of asking the court to instruct that each plaintiff was an agent for all the other plaintiffs on the claims in this case and to then group the plaintiffs together on the verdict form. The plaintiffs, specifically Fred Koch Holdings, adamantly opposed any instruction that all plaintiffs were agents for each other. Counsel for Fred Koch Holdings repeatedly argued in this trial that his clients should not be charged with the notice given or knowledge held by the other plaintiffs and advisors, except for Goldman Sachs. It is impossible under the law to treat the plaintiffs as one group on the verdict form but to distinguish between the plaintiffs as to their knowledge and reliance. The verdict form must be written so that the jury can return a verdict consistent with the parties' legal and factual positions. Thus, we have the undisputed need for a lengthy agency instruction (No. 7), for a party grouping instruction (No. 15), for instructions drafted as referring to

9

"plaintiff(s)," and for a verdict form listing each of the plaintiff groups. The parties' various objections are overruled.

Claims and Contentions--No. 17. The court adopts its comments made during the instruction conference on the use of "stream day capacity" in the plaintiffs' allegations. The plaintiffs objected at the instruction conference that "stream day capacity" did not match their allegations in the pretrial order, that this capacity allegation "would have an adverse impact" on their position at trial, and that "capacity" by itself is the "same way" that KII expressed the concept in its documents. The court believes its instructions plainly and directly informed the jury of the plaintiffs' capacity allegations.

In the pretrial order, the plaintiffs did not allege mere "capacity" but couched their claim in terms of "crude processing capacity." The evidence at trial identified the different kinds of refinery "capacity" used in the industry. The testimony from experts on both sides referenced one or more of these kinds of "capacity" in discussing and describing Pine Bend. The plaintiffs did not argue that "capacity" by itself has a settled meaning for the refinery industry, for Pine Bend Refinery, or for even their allegations. The instructions would have been misleading if they had referred only to "capacity" without any further reference or definition. The court was intolerant of its instructions becoming yet another piece in what appeared to be the plaintiffs' shell game on refinery

10

capacity.

The plaintiffs never explained their objection that "stream day capacity" would adversely impact their position at trial. Based on arguments during summary judgment and trial, the court understood "stream day capacity" to most closely proximate the kind of capacity which the plaintiffs had alleged was not disclosed. Indeed, the record shows that this was the same assumption that the plaintiffs' own expert made in rendering an opinion here. Having chosen this kind of capacity as the crux of their claim, the plaintiffs were not allowed to escape the consequences of that choice by pointing fingers at the defendants' unrestricted use of "capacity." Rather than obfuscate the meaning and scope of the plaintiffs' claims, the court chose to state them as plainly and directly as possible.

Clear and Convincing--No. 19, et seq. The plaintiffs repeatedly objected that the court erroneously stated this burden to prove "by a preponderance of the evidence that is clear and convincing." They also objected that the court's Instruction No. 19 is an inaccurate statement of Kansas law. In relevant part, this instruction reads:

> When a party, plaintiff or defendant, has the burden of proof on a claim or defense by a "a preponderance of evidence that is clear and convincing," you should consider the following definitions as to the quantity and quality of evidence. For the quantity of the evidence to be a preponderance, it must persuade you that the asserted claim is more

11

> probably true than not true. For the quality of the evidence to be clear and convincing, it should be "clear" in the sense that it is certain, plain to the understanding, unambiguous, and "convincing" in the sense that it is so reasonable and persuasive as to cause you to believe.

The plaintiffs specifically objected that this "statement regarding the quantity versus the quality of the evidence, we believe, is confusing, and there's no authority creating that type of distinction." (Trans. Vol. 72, p. 6962). The plaintiffs cite no Kansas case law for their objection and referred to something from the "Fifth Circuit" but did not cite that authority to the court.

The Kansas Supreme Court has consistently clarified that the "clear and convincing" standard is an intermediate burden that distinguishes between the quantity and quality of the evidence. For example, in *Newell v. Krause*, 239 Kan. 550, 557, 722 P. 2d 530 (1986), the Kansas Supreme Court explained: "Clear and convincing evidence is not a quantum of proof, but rather a quality of proof; thus, the plaintiff establishes fraud by a preponderance of the evidence, but this evidence must be clear and convincing in nature." More recently in *Ortega v. IBP, Inc.*, 255 Kan. 513, 528, 874 P.2d 1188 (1994), the Kansas Supreme Court held: "that clear and convincing evidence is not a quantum of proof but, rather, a quality of proof. A party having the burden of proving . . . must establish that claim by a preponderance of the evidence, but the evidence must be clear and convincing in nature." This distinction between quality and

12

quantity is firmly established in Kansas law.

The court instructed on this distinction in the case of *Ramirez v. IBP, Inc.*, No. 94-4101-SAC, and Instruction No. 19 is substantially the same instruction given in that case. The instruction is an accurate statement of the law in Kansas. More importantly, this instruction gives the jury more guidance in understanding the quantum and quality of proof needed to prove those elements and issues subject to this standard of proof. The court overruled the plaintiffs' objections to the use of this instruction and refused to give the plaintiffs' proffered instructions which modified this standard of proof and subsequent references to it.

Fraud--No. 27.

The plaintiffs made several objections to the court's proposed instructions regarding their Pine Bend fraud claims. The defendants were essentially satisfied with the instructions proposed by the court. In an effort to simplify and streamline the instructions pertaining to the Kansas common law fraud claims, the Texas common law fraud claims and the Texas statutory fraud claims, the court defined concepts, words and phrases common to all claims in Instruction No. 27 and then set forth the specific elements of each specific fraud claim in separate instructions. The court believes that its synthesis of common concepts and definitions is a reasonably accurate statement of the law of both

13

Kansas and Texas. In fact, if anything, the court's instructions in some instances are arguably more favorable to the plaintiffs than the ones they propose.

The plaintiffs complained that the court's instructions ignore distinctions between objective and subjective standards established under Kansas and Texas law. While the court's instructions largely dispense with those distinctions on each legal theory, the number and complexity of the plaintiffs' claims, as viewed against the backdrop of the facts of this case, clearly justified simplifying the fraud instructions. If this were a typical case involving a routine fraudulent setting and only one or two alternative theories of recovery, the court would be more inclined to set forth the distinctions urged by the plaintiffs. It belabors the obvious that this is not a run-of-the-mill case. At the time of the sale of their stock in 1983 for $1.1 billion, each plaintiff was receiving advice from experienced attorneys and sophisticated bankers. Each plaintiff was either a member of Koch Industries' board of directors, or was represented on the board by their appointed designee.

In their claims, the plaintiffs contended that the defendants had misrepresented or failed to inform them that the Pine Bend' stream day capacity was 145,000 barrels per day (15,000 barrels per day greater than the disclosed stream day capacity of 130,000) and that Koch had plans for expanding its stream day capacity to 155,000 barrels per day by the end of 1983. In light of the

14

size of these claims and the undisputed facts, the court can envision no meaningful or appreciable distinction between the objective and subjective standards suggested by the plaintiffs. Restated, because of the size of the plaintiffs' claimed damages, it did not matter whether the standard was subjective or objective. In the context of this case, instructing the jury to evaluate the materiality of a misrepresentation or omission under an objective "reasonableness" standard, as opposed to a subjective standard, would do little more than confuse the jury and lengthen the jury instructions which already span almost one hundred pages.

That the court's instructions collapsed the essential elements into a more concise form is not a valid objection as the instructions clearly encompassed the necessary elements. The court rejects the plaintiffs' request to provide explanatory commentary regarding the necessary "intent" of the defendant(s) following certain instructions as superfluous.

Finally, the court simply notes that its instructions have attempted to resolve the tension between competing legal concepts which the plaintiffs' proposed instructions ignored. In sum, the court believes that its instructions fairly stated the essential elements of the plaintiffs' viable fraud claims.

Fiduciary Duty--Nos. 36-38. As originally submitted and later proffered at the instruction conference, the plaintiffs' instructions on this theory included

15

no more than the two brief PIK-Civil 3d instructions for this area and the somewhat overstated rules from several fact-driven Kansas Supreme Court decisions. By doing so, the plaintiffs sought to put terms like, "very strict fiduciary duty," "fairness," "due regard" and "good faith," before the jury without giving any guidance in defining, understanding or applying those terms.[1] The plaintiffs' instructions also referred to factors and matters that have nothing to do with this case. The court's proposed instructions relied on the same Kansas case law but stated it in a more balanced and less argumentative manner and with more definitions. The court overrules any objection that the plaintiffs might have to the court omitting the plaintiffs' preferred argumentative presentation of this law.

The plaintiffs objected that the court's instructions do not describe the defendants' burden of proof as being three-fold: (1) a transaction conducted in good faith, (2) a full disclosure of material facts, and (3) an entirely fair

---

[1]These words are not ones that most people would readily agree on a common meaning regardless of context or setting. A word like "fairness" encompasses any number of value judgments and does not limit the jurors to those considerations directly bearing on the fiduciary's duty under the law. The same can be said of "good faith" which, as ordinarily defined, could extend to values and factors not directly bearing on a fiduciary relationship. Calling a duty "very strict" tells the average jurors nothing unless they understand the different legal relationships that are also called fiduciary in nature and the duties owed in each. In short, the plaintiffs' proposed jury instructions wrongly gave the jury the task of defining these terms within the legal framework of a fiduciary relationship.

16

transaction. The court does not believe that any of the cited Kansas Supreme Court decisions distinguish the proof of a transaction conducted in good faith from the proof of full disclosure of material facts. The plaintiffs' proffered jury instructions did not articulate what a party must show in proving that a transaction was conducted in good faith. Nor did the plaintiffs ever argue that the defendants would have to prove anything more than full disclosure to establish good faith under the facts of this transaction. It seems irrefutable that a person is honest in fact if he truthfully divulges all facts material to the transaction. For that matter, the truthful disclosure of all material facts would necessarily mean in the most circumstances the absence of any intent to deceive. After reading the case law from Kansas and from other jurisdictions and after considering the facts and circumstances of this case, the courts concludes that a transaction is necessarily conducted in good faith if the director truthfully divulges all material facts to the transaction. Thus, the court so instructed the jury in Instruction No. 37. Moreover, the court believes its instructions actually imposed a similar tripartite burden of proof: 1) good faith (complete and truthful disclosure of material facts); (2) fair transaction--fair dealing ("selling shareholder is dealt with fairly considering such factors as the timing, structure, terms and negotiations of the transaction," and (3) fair transaction--fair price ("selling shareholder is paid a fair price").

17

The plaintiffs adamantly objected that the court's instructions were erroneous as a matter of law in requiring them to prove actual reliance and damages. The plaintiffs opined that the court had created "elements of the claim that don't exist under Kansas law." (Trans. Vol. 72, p. 7016). The plaintiffs took the position that they have no burden whatsoever on their fiduciary duty claim and that liability is automatic if the defendants fail to carry their burden of proof. "That's just not the law in Kansas, and that, as a result of the beliefs, the plaintiffs were damaged. We don't believe--or as a result of their reliance. We believe that to be a result of their breach, so think the law is the burden-- that there is a fiduciary duty, that the burden is on Defendants to prove the three elements; if they prove it, then the jury shall award damages." (Trans. Vol. 72, p. 7017). In the instruction conference, the plaintiffs said they were relying on cases like *Blakesley v. Johnson*, 227 Kan. 495, 608 P.2d 908 (1980), where "upon a finding that defendant (sic) did not meet their burden, there's no additional finding required." (Trans. Vol. 72, p. 7018).

In *Blakesley*, the corporation repurchased or redeemed the plaintiff's shares for essentially the same price that the plaintiff had purchased them over a year earlier. Less than three weeks after the redemption, the defendant sold the corporation, including his stock and the stock formerly held by the plaintiff, for substantially more to a third party who required 100% of the

18

stock as a condition to its purchase of the corporation. Prior to the redemption of

the plaintiff's shares, the defendant never disclosed to the plaintiff the actual

sales price that he had negotiated for the third party's purchase of the

corporation. The Kansas Supreme Court concluded that the plaintiff "had a legal

right on the facts in this case to rely upon Johnson [the defendant] to make a full

disclosure." 227 Kan. at 504. It was "undisputed" in *Blakesley* that the

defendant did not disclose these material facts, that the plaintiff relied upon the

defendant in redeeming his shares, and that the defendant sold the corporation

just days later for an agreed per share price substantially higher than the

redemption price paid the plaintiff. Thus, there was no real reason for the court

to discuss whether the plaintiff sustained any damages as a result of the

defendant's breach.

Unlike *Blakesley*, there are here disputed factual issues whether the

plaintiffs did rely upon the defendants and whether the plaintiffs were actually

paid a price less than fair market value as a result of relying on the defendants.[2]

There is no dispute that a selling shareholder has a right to rely on a managing

director to make a complete and truthful disclosure of all facts. The court so

---

[2]In *Sampson v. Hunt*, 222 Kan. 268, 271, 564 P.2d 489 (1977), the trial
court found that the plaintiff selling shareholders "had relied upon" the defendant
director and that the defendant director had purchased the plaintiff's stock for
one-half its actual value "as a result" of the defendant's material omissions.

19

instructed in Instruction No. 37. The mere fact of having a right does not

necessarily establish either that the right was exercised or that the alleged

damages resulted from exercising the right. Both are propositions that must be

proved when in dispute.

A breach of fiduciary duty claim, like most other tort claims,

includes elements of causation and damages. *See, e.g., Hoselton v. Metz Baking

Co.*, 48 F.3d 1056, 1063 (8th Cir. 1995); *Jerlyn Yacht Sales, Inc. v. Wayne R.

Roman Yacht Brokerage*, 950 F.2d 60, 65 (1st Cir. 1991). "An essential element

of breach of fiduciary duty is causation. '[T]he stockholder must rely on the

misleading representation or omission in order to establish a cause of action for

breach of fiduciary duty.'" *Alta Health Strategies, Inc. v. Kennedy*, 790 F. Supp.

1085, 1097 (D. Utah 1992) (quoting *St. Louis Union Trust Co. v. Merrill Lynch,

Pierce, Fenner & Smith, Inc.*, 562 F.2d 1040, 1055 (8th Cir. 1977), *cert. denied*,

435 U.S. 925 (1978)). Another court said the same thing this way:

Finally, the causation element of the fiduciary duty claim equates to a
showing of reliance. In this regard, if plaintiff did not rely on defendants
when reaching his decision to sell, or if he would have made the same
decision despite having knowledge of the alleged omitted fact, any failure
to disclose cannot have caused him damage and recovery would be
improper. *See Babray v. Carlino*, 2 Ill. App. 3d 241, 252-53, 276 N.E.2d
435, 443-44 (1st Dist. 1971); *Henry's Drive-In v. Anderson*, 37 Ill. App.
2d 113, 124, 185 N.E.2d 103, 108 (1st Dist. 1962).

*Frain v. Andy Frain, Inc.*, 660 F. Supp. 97, 100 (N.D. Ill. 1987), *reconsideration*

*denied*, 1987 WL 10311 (N.D. Ill. Apr. 27, 1987).

The plaintiffs have not cited any authority that indicates plaintiffs in Kansas or in any other forum are relieved of the burden to prove the essential elements of causation and damages to a fiduciary duty claim. The Kansas cases do not define the defendants' burden of proof on fiduciary duty claims to include proof that the plaintiffs did not rely on the misrepresentations or omissions or that the plaintiffs were not damaged as a result of their reliance. Logically, the burden to prove causation and damages should lie with the party claiming both. Thus, the court believes its instructions are an accurate statement of Kansas law concerning the respective burdens of proof on fiduciary duty claims.

Fiduciary Duty--Director's Good-Faith Reliance--No. 39. The plaintiffs objected that this defense should apply only to a claim that the fiduciary breached the duty of due care as opposed to a claim, like here, that the fiduciary breached the duty of loyalty. The plaintiffs argued that they were unaware of "any circumstances" where this defense was used in a fiduciary duty case claiming breach of the duty of loyalty. The plaintiffs say their position is not taken with "absolute certainty" as "time has been extremely limited in preparing for" the court's "instructions." (Trans. Vol. 72, p. 7028).[3]

---

[3]The court's Instruction No. 39 is modeled after the defendant's requested Instruction No. 59 which was filed March 31, 1998. The plaintiffs had over two months to research this issue.

21

It is true that the defense of good-faith reliance on opinions and reports of others is most often found to have been asserted in cases involving allegations that the fiduciary breached the duty of due care. Even so, a cursory research effort yielded several duty of loyalty cases where good-faith reliance was asserted as a defense or as a basis for indemnification. *See, e.g., Boston Children's Heart v. Nadal-Ginard*, 73 F.3d 429, 436-37 (1st Cir. 1996); *Terrydale Liquidating Trust v. Barness*, 611 F. Supp. 1006, 1023, 1026 (D.C.N.Y. 1984); *In re Revco D.S., Inc.*, 118 B.R. 468, 506-08 (Bankr. Ohio 1990). Moreover, the court believes the instant case is one where the defense would be available on a claim for breach of the duty of loyalty. The individual defendants who lacked actual knowledge and were not in a position where they would be expected to know about the details of these accounting transactions could have relied in good faith upon the auditor's opinion regarding compliance with GAAP.

GAAP--Nos. 42 and 43. The plaintiffs vigorously objected to these instructions as taking away factual issues from the jury. The court modeled these instructions after the pattern jury instructions found in the American Bar Association's Model Jury Instructions on Securities Litigation. The defendants had requested instructions similar to those given by the court.

The court's instructions do not decide issues of fact that otherwise

22

belong with the jury. What is a financial statement, what should financial statements disclose, and what are explanatory notes to a financial statements are not issues of fact in this case. The court is unaware of any contradictions between this instruction and the testimony offered by any accounting expert witness.

The court's instruction on GAAP covered several basic concepts that were not actually contested by either side. The court addressed the source of GAAP, the professional judgments permitted by GAAP, and the unique concept of materiality under GAAP. The plaintiffs do not show that any of the court's statements are erroneous. In referring to GAAP as "guidelines," the court did not otherwise devalue them as being "mere," "discretionary," or "broad." Indeed, the court described GAAP as the "consensus among accountants on how economic resources and obligations should be measured, what information should be disclosed in financial statements, and how the information should be disclosed to present the company's financial position fairly." The court's instruction was intended to assist the jury in interpreting and applying APB 30, in understanding that professional judgment plays a role in applying APB 30, and in evaluating the expert testimony on this subject. The evidence of record demonstrates that the plaintiffs' accounting claim was not a simple matter of alleging non-compliance with a specific, detailed and mandatory GAAP. Indeed,

23

the evidence shows that the application of APB 30 necessarily tolerates a range

of permissible judgments in deciding whether an expense is infrequently

occurring. In short, the court properly informed the jury of several fundamental

concepts generally involved in interpreting and applying GAAP and left the

precise meaning and particular applications of APB 30 as issues for the jury to

decide. The court finds no error in its Instructions Nos. 42 and 43.

Director Charged with Knowledge from Financial Records--No. 47.

The plaintiffs proffered the following sentence to be added to the

court's Instruction No. 47: "A director not in active charge of a corporation is

not chargeable with the knowledge of those officers in active charge." The

court's instruction covers charging a director "with knowledge of the financial

condition and facts regarding the corporation's business that are disclosed to the

director from the records and documents made available." The court's

instruction does not concern imputing knowledge to one director based on what

another director may have learned from whatever source. Indeed, the plaintiffs'

proffered sentence addresses a point quite distinct from that covered by the

court's instruction. The proffered sentence actually concerns an exception to a

proposition on which the court has not instructed. Thus, the court does not

consider the proffered sentence as necessary to the accuracy of Instruction No.

47.

24

Verdict Form. The plaintiffs objected to the court's proposed verdict form as problematic and complex and tendered first their original general verdict form and second their modifications to the court's proposed verdict form. The defendants likewise objected to the verdict form on several grounds proposing some general interrogatories to the front of the form and some additional interrogatories to the body of the form. Several observations are in order.

The complexity of the verdict form is due principally to the plaintiffs' decision to pursue six alternative legal theories of recovery against the defendants on the Pine Bend Refinery claims. Sharing many common central elements, the theories still differed on one or more discrete points. The differences included the parties covered by a theory and the relief available under it. In such circumstances, a court rightfully becomes concerned over the possibility of an inconsistent jury verdict and may consider verdict forms that either improve the chances of detecting inconsistencies or minimize the chances of inconsistencies occurring.

The plaintiffs' original verdict form permitted the possibility of an inconsistent verdict and did nothing to reveal or reduce it. It asked for the jury's finding on each legal theory without even distinguishing between the plaintiffs' Pine Bend claims and Accounting claim. It put the onus on the jury to compare and contrast the respective elements under the different theories in an effort to

25

reach a verdict that was logically and factually consistent on the different claims

and theories. This would have been a considerable undertaking for the jury in

this case, as demonstrated by the substantial difficulty even the court and counsel

had in discerning the legal and factual overlap between the different theories and

claims for purposes of drafting the preliminary questions.

To assist the jury in understanding and applying the elements

common to the different theories and claims, the court drafted the common

preliminary questions. The court hoped that the preliminary questions also

would diminish the chance of an inconsistent verdict, would demonstrate that the

jury understood and applied the law properly, and would give the parties and the

court some way to understand the basis for the jury's decision. The preliminary

questions were never intended to be an obstacle to the jury's ability to return a

unanimous verdict on the actual claims, and the court believes the preliminary

questions did not impede the jury in doing so here.

The plaintiffs' proffered modifications to the court's verdict form

did little more than eliminate all references to their burden of proof, add to the

defendants' burden of proof on the fiduciary duty theory, and restate the

interrogatories in a manner that was less neutral and more favorable to them.

Though admittedly complex, the court's verdict form was superior to those

proffered by the parties and was not improved by the substantive changes

proffered during the instruction conference. The court believes any later shortcomings with the verdict form were detected early in the jury's deliberations and were promptly and effectively cured.

Williams Pipeline Claim. Following the instruction conference, the court modified the plaintiffs' third claim concerning Pine Bend to be consistent with the plaintiffs' requested changes. After closing arguments, the defendants objected to this change saying there was no separate identifiable basis in the record for awarding any damages on a Williams Pipeline claim. In response, the plaintiffs' counsel conceded that the issues and allegations concerning Williams Pipeline are related strictly to the expansion claims and are not a "separate," "stand-alone" claim for damages. Based on this representation, the court left the reference to Williams Pipeline in Instruction No. 17 as a supporting factual contention but deleted all other references to Williams Pipeline as a claim on which the plaintiffs could recover. Instruction No. 17 fairly informed the jury of the plaintiffs' Refinery expansion claims and their connection to the Williams Pipeline reversal allegations. It would have been misleading and confusing to the jury to have kept the Williams Pipeline references in the different element instructions when those allegations were not a "stand-alone" claim for damages. Thus, the court's last-minute changes were necessary and proper as a result of the plaintiffs' counsels' most recent position taken on the Williams Pipeline

issue.

**FED. R. EVID. 801(d)(2)(C)**

During their case-in-chief, the plaintiffs sought to offer an excerpt

from the deposition of Lee Solomon, an expert retained by the defendants and

scheduled to be called as a witness in the defendants' case-in-chief. The

plaintiffs argued that under the analysis found in the Fifth Circuit's decision in

*Collins v. Wayne Corp.*, 621 F. 2d 777 (5th Cir. 1980), they should be permitted

to treat Mr. Solomon's statements as admissions by a party opponent under Fed.

R. Evid. 801(d)(2)(C). The defendants objected, noting that they intended to call

Mr. Solomon in their case-in-chief and that the plaintiffs could ask him questions

about his deposition during cross-examination.

At the time of the plaintiffs' proffer, it was the court's

understanding that Mr. Solomon was only retained by the defendants for the

purpose of giving an expert opinion at trial and that he was not retained in any

other capacity by the defendants. Based upon this perception, the court

concluded that the defendants' retention of Mr. Solomon as an expert did not

appear to be the same as the "speaking agent" authority accepted by the court in

*Collins*. Instead, the court believed that the Third Circuit's analysis in *Kirk v.*

*Raymark Industries, Inc.*, 61 F.3d 147 (3rd Cir. 1995), *cert. denied*, 516 U.S.

1145 (1996), to be correct. In pertinent part, the Third Circuit stated:

28

In theory, despite the fact that one party retained and paid for the services of an expert witness, expert witnesses are supposed to testify impartially in the sphere of their expertise. Thus, one can call an expert witness even if one disagrees with the testimony of the expert. Rule 801(d)(2)(C) requires that the declarant be an agent of the party-opponent against whom the admission is offered, and this precludes the admission of the prior testimony of an expert witness where, as normally will be the case, the expert has not agreed to be subject to the client's control in giving his or her testimony. *See Sabel v. Mead Johnson & Co.,* 737 F.Supp. 135, 138 (D.Mass. 1990). Since an expert witness is not subject to the control of the party opponent with respect to consultation and testimony he or she is hired to give, the expert witness cannot be deemed an agent. See Restatement (Second) of Agency § 1 cmt. a (1958) ("The relation of agency is created as the result of conduct by two parties manifesting that one of them is willing for the other to act for him subject to his control, and that the other consents so to act.").

61 F.3d 164. In a footnote, the Third Circuit made this statement about the Fifth

Circuit's decision in *Collins* which is relevant to the plaintiffs' argument that

Solomon is an "agent" of the defendants for purposes of Rule 801(d)(2)(C):

In the case before us, unlike *Collins*, there was no explicit finding on the record that Dr. Burgher was an agent of the defendant. To the extent that *Collins* holds that an expert witness who is hired to testify on behalf of a party is automatically an agent of that party who called him and consequently his testimony can be admitted as non-hearsay in future proceedings, we reject this rule.

61 F.3d at 164 n.20. Like the Third Circuit, this court rejects *Collins* to the

extent that it suggests that an expert who is hired by a party is inexorably an

agent of that party under Rule 801(d)(2)(C).

After orally announcing that tentative ruling, the plaintiffs were

afforded an opportunity to proffer additional facts demonstrating that Mr.

Solomon is an agent of the defendants under the criteria suggested by the court.

The plaintiffs proffered none. Consequently, following the analysis set forth in

*Kirk*, the court precluded the plaintiffs from offering Mr. Solomon's deposition

testimony as non-hearsay under Rule 801(d)(2)(C). Upon further reflection, the

court believes this analysis and ruling sound. Moreover, the plaintiffs were free

to cross-examine Mr. Solomon about his deposition testimony during the

defendants' case-in-chief and thus suffered little or no prejudice from this ruling.

## REBUTTAL EVIDENCE

Prior to the close of the defendants' case-in-chief, the court

instructed the plaintiffs to file a written proffer detailing the rebuttal evidence

they would offer if permitted. The defendants filed a written objection to the

evidence proffered by the plaintiffs in which they argued that the court should

exclude the proffered evidence as improper rebuttal. As the court was drafting

an order denying the plaintiffs' request to present rebuttal evidence, the plaintiffs

filed an additional memorandum in support of their request to introduce limited

rebuttal testimony. During trial, the court entered a short order denying the

plaintiffs' request to offer rebuttal evidence. Now afforded greater time to state

the reasons for its ruling in writing, the court will briefly elaborate on the basis of

its decision to exclude the proffered rebuttal testimony.

30

## Legal Standards

"The admission of rebuttal testimony is subject to the discretion of the trial court." *Marsee v. United States Tobacco Co.*, 866 F.2d 319, 324 (10th Cir. 1989) (citing *Grant v. Brant*, 796 F.2d 351, 356 (10th Cir. 1986) and *Whiteley v. OKC Corp.*, 719 F.2d 1051, 1055 (10th Cir. 1983)). There is no abuse of discretion in excluding rebuttal evidence that is cumulative or repetitive of issues raised in the plaintiff's case-in-chief, *see Marsee*, 866 F.2d at 324, nor is there an abuse of discretion in excluding rebuttal evidence available to the plaintiffs during their case-in-chief when there is no indication that the evidence introduced in the defendants' case-in-chief was unexpected. *See Pandit v. American Honda Motor Co., Inc.*, 82 F.3d 376, 382-83 (10th Cir. 1996) (citing *Lubanski v. Coleco Industries*, 929 F.2d 42, 47 (1st Cir. 1991) (affirming exclusion of rebuttal evidence that was available to plaintiff during her case-in-chief and not unexpected)). In short, rebuttal is not an opportunity for the plaintiffs to simply get in the last word.

## Analysis

As a general observation, the plaintiffs were afforded ample opportunity to fully and fairly present their case. As the court previously noted during trial, the plaintiffs' presentation of evidence (excluding time attributable to illness of counsel, deaths of persons related to the litigants or this court and

31

other unavoidable delays) was approximately twice as long as plaintiffs' counsel had originally estimated prior to the commencement of trial. In any event, and irrespective of the differential between the plaintiffs' estimated trial time and the actual time it took to present their case, the court believes that the plaintiffs enjoyed wide latitude in the presentation of evidence and could have easily elicited from both William Koch and Gary Gibbs the testimony they sought to introduce in rebuttal. As the court previously indicated, the same general areas of testimony as those proffered for rebuttal were already covered and explored at length during the plaintiffs' case-in-chief. That the defendants' case-in-chief would focus on identifying and exploring weaknesses in the plaintiffs' case should have come as no surprise. Moreover, although the plaintiffs claim surprise at new theories or new evidence, the pretrial discovery in this case was legion and should have alerted the plaintiffs as to the likely response of the defendants.

### William Koch's Testimony

The plaintiffs' purported surprise at Charles Koch's testimony regarding efforts to "debottleneck" the Pine Bend Refinery after the sale of their stock in June of 1983 is disingenuous at best. As one constant throughout this entire case, it has been the defendants' position that it was always Koch Industries' goal to expand the productivity, efficiency and profitability of the

32

Pine Bend refinery and that the plaintiffs knew from oral statements and written documents that this was Koch Industries' goal. Before this trial commenced, the plaintiffs had to know that debottlenecking was one of many specific measures taken by Koch Industries to achieve its goal of expanding the productivity, efficiency and profitability of the Pine Bend refinery and that debottlenecking was likely to occur during the fall 1983 turnaround. Nothing introduced at trial changed that likelihood or the probability that the defendants would raise the issue during their case-in-chief. For example, during the plaintiffs' case-in-chief, Bernard Paulson, former president of Koch Refining Company called as an adverse witness, testified about Koch Industries' repeated and continuous efforts to debottleneck the Pine Bend Refinery. Paulson testified before William Koch was called as a witness. During the plaintiffs' case-in-chief, William Koch actually testified about Paulson's efforts to debottleneck the Pine Bend Refinery. William Koch also testified at great lengths about what information was disclosed at board meetings.

In any event, the pretrial discovery surrounding Charles Koch's presentations to the board of directors regarding refinery expansion was voluminous and clearly should have alerted the plaintiffs to this subject matter. The court committed no error in precluding the plaintiffs from recalling William Koch in rebuttal.

33

<u>Gary Gibbs' Testimony</u>

As the centerpiece to their need to recall Gibbs in rebuttal, the plaintiffs argued that at no point prior to the defendants' case-in-chief were they aware that the defendants would suggest that the write-downs at issue were not infrequent under GAAP because Koch Industries is a risk-taking business. The defendants responded, arguing that nothing new was introduced during their case-in-chief of which the plaintiffs were previously unaware. The defendants argued that it is Koch Industries' practice to take risks and that such risk taking "is part and parcel of what defendants have always said."

There is no doubt that prior to trial the plaintiffs were aware that Koch Industries is a company that undertakes entrepreneurial enterprises eschewed by others who seek to avoid risk. It is also clear that the plaintiffs knew that throughout its history under Charles Koch's leadership, Koch Industries consistently wrote-down poor investments as losses. Risk taking was and apparently remains part and parcel of Koch Industries' business strategy. Such risk taking is reflected in Koch Industries' history of writing down impaired assets and therefore is reflected in the company's consolidated financial statements. Indeed, it was the defendants' consistent position during summary judgment and at trial that these kinds of losses associated with new ventures, investments, and risks were not unusual or infrequently occurring for Koch

34

Industries as a whole. In short, the plaintiffs were not unfairly prejudiced by the court's decision to preclude Gibbs from addressing this issue as it was a constant theme of the defense throughout this case and therefore should not, as claimed by the plaintiffs, come as any surprise. Nor did the court error in preventing Gibbs from simply repeating his opinions on the propriety of Koch Industries' financial statements one more time.

The court will make no effort to address all of the other points raised by the plaintiffs in regard to their request to recall Gibbs to testify on other subjects. Suffice it to say that Gibbs was provided a fair opportunity to express his opinions on all accounting issues and that nothing presented by the plaintiffs convinces the court that Gibbs should have been permitted another opportunity to repair or reexplain the logical inconsistencies and substantial weaknesses in his prior testimony. In short, nothing identified by the plaintiffs demonstrates that the defendants' case included anything that could not have been reasonably anticipated during their own case-in-chief. The court committed no error in precluding the plaintiffs from recalling Gary Gibbs in rebuttal.

**OTHER PROFFERED EVIDENCE:  *PRECISION* LITIGATION**

The court again having reconsidered its previous rulings on the videotape excerpts from the *Precision* litigation, stands by all of its prior rulings

35

on these same or similar issues.[4] The court again concludes that exclusion of this evidence under Fed. R. Evid. 403, Fed. R. Evid. 404, Fed R. Evid. 405, Fed. R. Evid. 608 and Fed. R. Evid. 611 was appropriate. Exploring these collateral matters would have shed little light on the issues in this case and would have at best confused the jury and unnecessarily lengthened the trial.

## *KOCH III* LITIGATION

The plaintiffs' request to introduce documents related to the *Koch III* litigation was denied as moot in light of the defendants' decision to waive the statute of limitations defense.

## OTHER PENDING MATTERS

The docket sheet suggests that the court never formally considered a number of written motions. The court believes all of those motions were either directly or indirectly considered and ruled upon in other orders or during chambers conferences. For purposes of achieving a clean record, the court hereby states its formal ruling with respect to the following motions.

The court grants the plaintiffs' motion for leave to substitute brief on damage claims (Dk. 696); the plaintiffs' motion for leave to file surreply to defendants' motion in limine regarding document destruction (Dk. 708); and the

---

[4]Many of the court's prior rulings on these issues, both written and oral, are under seal.

36

plaintiffs' motion for oral argument on their motion for reconsideration (Dk. 746). The court denies the plaintiffs' motion to strike William Hanna's testimony (Dk. 781) as so reflected in the trial transcript (Vol. 9, p. 686). The court denies as moot the plaintiffs' motion for advance disclosure from defendants on post-1985 evidence (Dk. 782), as the defendants agreed to provide such disclosure (Vol. 9, pp. 681-82). The court grants in part and denies in part the plaintiffs' motion for order prohibiting improper questioning (Dk. 806) as reflected in the trial transcript (Vol. 29, pp. 2691-2700). The court denies as moot the defendants' JMAL motions (Dk. 824, 825 and 826) filed at the close of the plaintiffs' case. The court grants in part and denies in part the plaintiffs' motion for modification of court's in limine order on post-1985 lawsuits (Dk. 831) as reflected in the trial transcript (Vol. 48, pp. 4605-07); the defendants' motion for reconsideration (Dk. 884) of court's memorandum and order filed June 5, 1998, as reflected in sealed chambers conferences; and the plaintiffs' motion for judgment as a matter of law that the defendants owed a fiduciary duty (Dk. 904) as reflected in the court's final instructions. The court denies as moot the plaintiffs' motions for judgment as a matter of law that Charles Koch was a control person (Dks. 905 and 906) based upon the parties' subsequent stipulation (Dk. 912). The court denies the Simmons plaintiffs' motion for reconsideration of dismissal of Texas Securities Act Claim (Dk. 915) as reflected in the court's

37

final instructions.

IT IS THEREFORE ORDERED that the defendants' JMAL

motions (Dks. 824, 825 and 826) filed at the close of the plaintiffs' case and the

defendants' JMAL motions (Dks. 907, 908, 909, 911 and 913) filed at the close

of all evidence are denied as moot;

IT IS FURTHER ORDERED that the court's rulings with respect

to the jury instructions, to the plaintiffs' designation of Lee Solomon's

deposition, to the plaintiffs' proffered rebuttal evidence, to the plaintiffs'

proffered evidence on the *Precision* litigation, and to the *Koch III* litigation are

herein supplemented and explained;

IT IS FURTHER ORDERED that the plaintiffs' motion for leave

to substitute brief on damage claims (Dk. 696); the plaintiffs' motion for leave to

file surreply to defendants' motion in limine regarding document destruction

(Dk. 708); and the plaintiffs' motion for oral argument on their motion for

reconsideration (Dk. 746) are granted;

IT IS FURTHER ORDERED that the plaintiffs' motion to strike

William Hanna's testimony (Dk. 781) as reflected in the trial transcript (Vol. 9,

p. 686), and the Simmons plaintiffs' motion for reconsideration of dismissal of

Texas Securities Act Claim (Dk. 915) as reflected in the court's final instructions

are denied;

38

IT IS FURTHER ORDERED that the plaintiffs' motion for advance disclosure from defendants on post-1985 evidence (Dk. 782) by reason of the defendants' subsequent agreement to provide such disclosure (Vol. 9, pp. 681-82), and the plaintiffs' motions for judgment as a matter of law that Charles Koch was a control person (Dks. 905 and 906) by reason of the parties' subsequent stipulation (Dk. 912) are denied as moot;

IT IS FURTHER ORDERED that the plaintiffs' motion for order prohibiting improper questioning (Dk. 806) as reflected in the trial transcript (Vol. 29, pp. 2691-2700); the plaintiffs' motion for modification of court's in limine order on post-1985 lawsuits (Dk. 831) as reflected in the trial transcript (Vol. 48, pp. 4605-07); the defendants' motion for reconsideration (Dk. 884) of court's memorandum and order filed June 5, 1998, as reflected in sealed chambers conferences; and the plaintiffs' motion for judgment as a matter of law that the defendants owed a fiduciary duty (Dk. 904) as reflected in the court's final instructions are granted in part and denied in part.

Dated this 7th day of July, 1998, Topeka, Kansas.

Sam A. Crow, U.S. District Senior Judge

39